# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION

 3

     IN RE:  BOSTON SCIENTIFIC CORP.
 4   PELVIC REPAIR SYSTEM                    MDL 2326
     PRODUCTS LIABILITY LITIGATION
 5
     Civil Action No. 2:13-cv-24772
 6   _____

 7   DEPOSITION OF KATRINA BAGWELL        April 24, 2019

     _____
 8

     KATRINA BAGWELL,
 9
             Plaintiff,
10
     vs.
11
     BOSTON SCIENTIFIC CORPORATION,
12
             Defendant.
13   _____

14

15           The deposition of KATRINA BAGWELL, taken
16   before Leeann Stellor, a Registered Merit Reporter,
17   Certified Realtime Reporter, and a Notary Public
18   in and for the County of Summit and the State of
19   Colorado, at 13438 Berry Hill Lane, Pine, Colorado,
20   on Wednesday, April 24, 2019, at the hour of 10:15
21   a.m., pursuant to Notice.
22

23

24

25
```

Katrina Bagwell

1   APPEARANCES:
2
3        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
     P.L.L.C.
4     BY: DANIEL THORNBURGH, ESQ.
          and
5     LYDIA T. LUCIUS, ESQ.
     17 East Main Street
6     Suite 200
     Pensacola, Florida  32502
7     (850) 202-1010
     Dthornburgh@awkolaw.com
8     appeared on behalf of the Plaintiff
9   FAEGRE, BAKER, DANIELS
     BY: HAROON ANWAR, ESQ.
10     300 North Meridian Street
     Suite 2700
11     Indianapolis, Indiana  46204
     (317) 237-0300
12     Haroon.anwar@faegrebd.com
     appeared on behalf of the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25

1          I N D E X
2
   DEPOSITION WITNESS:                    PAGE
3   KATRINA BAGWELL
4   Examination by Mr. Anwar                4
5
6   DEPOSITION EXHIBITS MARKED:
   NO.        DESCRIPTION           PAGE
7
   Exhibit 1   Amended notice of Deposition     27
8
   Exhibit 2   Boston Scientific Brochure      29
9           BSCM15800019847 - 19854
10  Exhibit 3   Two photographs         30
11  Exhibit 4   Letters from Family Members    31
12  Exhibit 5   Receipts         34
13  Exhibit 6   Thumb Drive         35
14  Exhibit 7   Evergreen Physical Therapy papers  36
15  Exhibit 8   Medical, billing, personal records  43
16  Exhibit 9   November 18, 2009 Patient Consent  133
           Forms
17          BAGWELLK_LUTHERAN MEDICAL
           CENTER_MEDICAL_000205 - 206
18
   Exhibit 10  December 3, 2018 Plaintiff Fact    138
19          Sheet
20  Exhibit 11  December 3, 2018 Updated Plaintiff  145
           Fact Sheet
21
   Exhibit 12  Photograph of Devices used by     146
22          Plaintiff to Alleviate Pain
23
24
25

1          P R O C E E D I N G S
2          (Witness duly sworn.)
3          KATRINA BAGWELL,
4   having been first duly sworn, was examined and
5   testified as follows:
6             EXAMINATION
7   BY MR. ANWAR:
8     Q.   Good morning, Mrs. Bagwell.
9     A.   Good morning.
10    Q.   Could you please state and spell your
11  full name for the record.
12    A.   Katrina Louise Bagwell, K-a-t-r-i-n-a
13  L-o -- middle name Louise, L-o-u-i-s-e, last name
14  Bagwell, B-a-g-w-e-l-l.
15    Q.   Thank you.  Have you ever gone by any
16  other names?
17    A.   Yes.
18    Q.   What other names have you gone by?
19    A.   Katrina Louise Rael, R-a-e-l, last name,
20  and then my maiden name Romero, R-o-m-e-r-o.
21    Q.   Okay.  Thank you.  My name is Haroon
22  Anwar.  I represent Boston Scientific in this
23  lawsuit.  Do you understand that?
24    A.   Yes, I do.
25    Q.   And we haven't met before today; is that

1   correct?
2     A.   Correct.
3     Q.   Okay.  Have you ever been deposed before?
4     A.   Never.
5     Q.   Never, okay.  Well, just to try and make
6   things as easy as possible today, I'm going to go
7   over a few ground rules with you.  You're doing a
8   great job, and I'm sure your attorney has already
9   discussed some of these rules with you, but just to
10  make sure we're on the same page.
11         The first and the most important
12  rule for today's deposition is that you're under the
13  same oath to tell the truth as if you were actually
14  in a court of law.  Do you understand that?
15    A.   Yes.
16    Q.   Okay.  I realize today I will be asking
17  you a lot of questions on a variety of topics
18  related to your claims in the case, and I know some
19  of your -- the treatment you've received may date
20  back a number of years.  If you -- if you don't know
21  the answer to my question, it's okay to say you
22  don't know.
23         There may be times where I ask for
24  your best estimate.  And if you're able to give your
25  best estimate, I would appreciate it if you would do

Katrina Bagwell

1  so.  Does that make sense?
2      A.   Yes, it does.
3      Q.   To make life as easy as possible for the
4  court reporter, and you've been doing a great job
5  already on both fronts, first I would ask that you
6  just verbalize all of your answers.  During
7  conversations it's very easy to head nod or say
8  uh-huh, uh-huh, but it doesn't show up very well on
9  the transcript.  So if you could say yes, no,
10  verbalize your answers, that would be great.
11      A.   Yes.
12      Q.   Does that make sense?
13      A.   Yes, it does.
14      Q.   And the other rule, which is also for our
15  court reporter, is if you could allow me to finish
16  my question before answering.  That would be great
17  as well just because it's difficult for the court
18  reporter to get everything down when we're speaking
19  over each other.  Make sense?
20      A.   I understand.
21      Q.   Okay.  Have you taken any medications in
22  the last 24 hours?
23      A.   In the last 24 hours?
24      Q.   Yes.
25      A.   Well, I've taken my gabapentin and

1  Ibuprofen, and I had -- was it 24 hours?  What time
2  is it now?
3           MR. THORNBURGH:  It's just about
4  10:15.
5      A.   And that's it.
6      Q.   Okay.  So --
7      A.   Because I refrained from my pain meds
8  because I knew of the deposition.
9      Q.   Well, do the -- would the pain meds
10  affect your sort of ability to recall events or to
11  testify here today?
12           MR. THORNBURGH:  Objection.
13      Q.   To the best of your knowledge?
14      A.   No.
15      Q.   And what I'm getting at is you just
16  mentioned that you didn't take your pain meds --
17      A.   Uh-huh.
18      Q.   -- because you were testifying here
19  today.  Why didn't you take your pain meds?
20           MR. THORNBURGH:  To the extent --
21  objection.  To the extent that it calls for an
22  attorney/client communication, I'm going to ask you
23  not to answer that question.
24           THE WITNESS:  Okay.
25      Q.   And I'm not asking for anything that

1  you've spoken about with your attorney.  Just if
2  you -- if there's, like, a specific reason that you
3  didn't take your pain medications because you
4  believed it -- did you believe it would affect your
5  testimony here today or affect your ability to
6  continue during the deposition here today?
7           MR. THORNBURGH:  Objection.  She may
8  not be able to answer that question in light of my
9  prior objection.
10           MR. ANWAR:  Okay.
11           MR. THORNBURGH:  Okay?
12           MR. ANWAR:  Are you instructing the
13  witness not to answer?
14           MR. THORNBURGH:  To the extent that
15  it calls for communications that she and I had, I'm
16  instructing her not to answer the question.
17      Q.   And so again, I'm not looking for any
18  communications, like, anything substantively about
19  your conversation with your attorney, so I don't
20  want to know what he told you.  I don't want you to
21  tell me what you told him.
22           I guess I'm just trying to figure
23  out whether independently there's any reason that
24  you didn't take your pain medications because of
25  today's deposition?  Is that fair?

1      A.   Well --
2      Q.   Go ahead.
3           MR. THORNBURGH:  Well, your question
4  elicits a response that is protected by the
5  attorney/client communication.  That's all you need
6  to know.
7           MR. ANWAR:  I'm --
8      Q.   And so I'm asking -- so there's -- let me
9  just say this.
10           Outside of -- outside of the
11  conversations you have had with your attorney,
12  there's -- whatever was discussed between your
13  attorney, that's between you.  But besides those
14  conversations, there's no other independent reason
15  you decided to take -- not take your pain
16  meditations today?
17           MR. THORNBURGH:  Objection.
18           MR. ANWAR:  She can answer.  I'm not
19  asking --
20           MR. THORNBURGH:  I'm going to -- hold
21  on -- I'm going to instruct her -- because of the
22  way you framed that question, it's -- it calls for a
23  disclosure of a attorney/client communication.  It
24  just does.  So I'm going to instruct the witness not
25  to answer that question.

Katrina Bagwell

Page 10

1    MR. ANWAR: It doesn't. I'm asking
2 her to confirm --
3    MR. THORNBURGH: It's not --
4    MR. ANWAR: -- that there's not any
5 other reason other than --
6    MR. THORNBURGH: Then ask the
7 question a different way than you just did.
8    Q.   I'm asking you to confirm that there's no
9 independent reason that you decided not to take
10 your -- your pain medications here today, before
11 today's deposition?
12    MR. THORNBURGH: Same objection.
13 Also to form.
14    Q.   Is there any independent -- any other
15 reason you decided not to take your medication here
16 today, your pain medication? Are you -- and you can
17 answer yes or no. I'm not asking for the
18 conversations between you and your attorney.
19    A.   Well --
20    Q.   And I would appreciate it, for the
21 record, if you not look to your attorney for
22 instructions.
23    MR. THORNBURGH: Hold on a second,
24 because the question that you're asking calls for
25 disclosure of attorney/client communication. It

Page 11

1 just does.
2    MR. ANWAR: Okay. Listen, if that's
3 your objection and you're instructing your
4 witness -- your client not to answer, you can go
5 ahead and do that.
6    Otherwise, sort of the speaking
7 objections are completely inappropriate. We're in a
8 federal court.
9    MR. THORNBURGH: You -- you --
10    MR. ANWAR: You can object to form.
11    MR. THORNBURGH: Your questioning --
12 just calm down. Your -- your questioning is -- I'm
13 not trying to tell you how to answer your -- how to
14 ask your question.
15    But the way you're asking it
16 naturally calls for a disclosure of attorney/client
17 communication. And because of that, I'm going to
18 instruct my witness not to answer the question until
19 you ask it in a way that doesn't require that
20 disclosure.
21    Q.   As you sit here today --
22    MR. THORNBURGH: The only thing
23 that's important is just ask her if she's taking any
24 medication that would inhibit her ability to provide
25 truthful and accurate testimony.

Page 12

1    MR. ANWAR: No, and that's fair. And
2 I'm just trying to understand why --
3    MR. THORNBURGH: That's all that
4 matters.
5    Q.   Let me ask you this: How often do you
6 take -- so let me back up for a second.
7    You mentioned the gaba -- what is
8 it?
9    A.   Gabapentin.
10    Q.   Gabapentin. Why do you take that?
11    A.   Because it helps with my nerve damage.
12    Q.   It helps with your nerve damage?
13    A.   Uh-huh.
14    Q.   Do you know what type of medication it
15 is?
16    MR. THORNBURGH: Objection.
17    MR. ANWAR: I'm asking for her
18 knowledge.
19    Q.   Do you -- do you have -- do you know what
20 type of medication it is? Or why are you taking it,
21 to your understanding --
22    MR. THORNBURGH: Objection.
23    Q.   -- for your nerve damage?
24    MR. THORNBURGH: Sorry. Objection.
25 Form.

Page 13

1    Q.   And if you don't know, you can say "I
2 don't know." That's a totally fair response.
3    Do you know why your doctor
4 prescribed you the gabapentin?
5    A.   Yes.
6    Q.   Can you tell me why he prescribed it to
7 you?
8    A.   She.
9    Q.   She. I'm sorry.
10    A.   To help with my nerve damage.
11    Q.   Okay. Do you have any understanding of
12 why you're taking that medication, other than that?
13    MR. THORNBURGH: Asked and answered.
14 Objection to form.
15    A.   I just answered that.
16    Q.   Excuse me?
17    A.   I just answered your question. I don't
18 understand.
19    Q.   Okay. And if -- if the answer is no,
20 that's totally fine.
21    A.   I didn't say no.
22    MR. THORNBURGH: She answered your
23 question. There's not further information to
24 provide.
25    MR. ANWAR: Listen, I would

Katrina Bagwell

Page 14

1 appreciate it if you could --
2         MR. THORNBURGH: Well, just --
3         MR. ANWAR: -- just limit the
4 speaking objections.
5         MR. THORNBURGH: But you're still
6 asking the same question. After she gives an
7 answer, you keep asking the same question.
8         MR. ANWAR: If we have to stop the
9 deposition and get the magistrate on the phone --
10        MR. THORNBURGH: I can't believe that
11 this is such a big deal. I mean, you --
12        MR. ANWAR: You're coaching your
13 witness.
14        MR. THORNBURGH: I'm not. I'm not.
15 Listen, calm down.
16        My client is here. She's
17 obviously nervous, and -- and you are beginning to
18 be unprofessional. And so I'm going to ask you to
19 calm down, relax, and ask your questions, and she's
20 going to do her best to answer them. She just did.
21        MR. THORNBURGH: Listen, I'm not -- I'm
22 not in any way attempting to be unprofessional, nor
23 do I think I'm being unprofessional. I'm simply
24 asking that you limit your speaking objections.
25        And if your client simply doesn't

Page 15

1 know the answer to my question, she's free to say
2 so. And I don't want to argue --
3         MR. THORNBURGH: She does know the
4 answer to the question. She answered it already.
5 Just ask her is there any other reason. I mean,
6 come on.
7         MR. ANWAR: Okay. We can move on,
8 but I would appreciate, again, that you limit the
9 speaking objections. I'm not here to argue with
10 you.
11        MR. THORNBURGH: I'd appreciate it
12 that when she answers your question, you move on to
13 the next question without asking it again and again
14 and again.
15        MR. ANWAR: If we need to stop the
16 deposition and call the magistrate, we will.
17    Q.   Mrs. Bagwell, you mentioned also that
18 your -- so you mentioned the gabapentin. Which one
19 of your physicians prescribed that for you?
20    A.   My pelvic floor doctor.
21    Q.   Do you know her name?
22    A.   Dr. Gerig.
23    Q.   Dr. Gerig?
24    A.   And Carrie Reynolds is her nurse
25 practitioner.

Page 16

1    Q.   Okay. How long have you been taking that
2 medication?
3    A.   Since 2014.
4    Q.   Okay. And how often do you take that
5 medication?
6    A.   Every day.
7    Q.   Okay. How many times a day do you take
8 that medication?
9    A.   Right now I'm taking it four times a day.
10   Q.   Four times a day?
11   A.   Uh-huh.
12   Q.   That was a yes?
13   A.   Yes.
14   Q.   Okay. Thank you.
15   A.   Sorry.
16   Q.   I'm sorry. I'm just trying to -- you're
17 doing a great job. And I understand that you may be
18 a little nervous about today's deposition, but
19 you're doing a great job.
20        You also mentioned that you took
21 Ibuprofen; is that correct?
22   A.   Yes.
23   Q.   Okay. How often do you take Ibuprofen?
24   A.   Whenever -- I -- I just had mouth surgery
25 here (indicating), and so when I have an ache I take

Page 17

1 it.
2    Q.   The Ibuprofen?
3    A.   Uh-huh.
4    Q.   That's a yes?
5    A.   Yes.
6    Q.   Okay. And how recently did you have the
7 mouth surgery that you just mentioned?
8    A.   About a month ago.
9    Q.   And so are you taking the Ibuprofen
10 related to sort of soreness that you're experiencing
11 related to the mouth surgery that you had?
12   A.   Uh-huh. Yes.
13   Q.   Okay.
14   A.   I just took one.
15   Q.   Was that before today's deposition?
16   A.   It was at 6:30 in the morning.
17   Q.   Okay. I understand. And so those are
18 the only medications you've taken in the last
19 24 hours, correct?
20   A.   Correct.
21   Q.   Now, you mentioned -- what other
22 medications are you currently taking? Well,
23 actually, strike that. Let me back up for a second.
24        The medications, the two that
25 you've just mentioned that you've taken in the last

Katrina Bagwell

Page 18

1   24 hours, would those in any way affect your ability
2   to testify truthfully here today?
3       A.   No.
4       Q.   Now, you mentioned also that you do take
5   pain medication; is that correct?
6       A.   Correct.
7       Q.   What pain medication are you currently
8   taking?
9       A.   Are you ready to write it down?
10      Q.   The court reporter's getting everything
11  down.  So just to the best of your knowledge, if you
12  can.
13      A.   So Percocet, gabapentin, Flexeril,
14  Ibuprofen.  Now, all these meds are all at different
15  times, different things.  Xanax.  It's hyoscyamine.
16  And then Valium.
17      Q.   You said Valium?
18      A.   Valium.  Apri -- Apripol (ph).  I don't
19  know how to spell it.
20           MR. THORNBURGH:  That's okay.
21      Q.   That's okay.
22      A.   And then so medicines I put in my mouth,
23  those are the ones you want?  Because I also put
24  medicine in my vagina.
25      Q.   I understand.

Page 19

1            MR. THORNBURGH:  Would you like that
2   list as well?
3            MR. ANWAR:  Yes, please.
4       A.   So I have to crush up the Valium and put
5   it in a capsule, and then it's inserted into my
6   vagina.
7            And then my new care plan from my
8   pelvic floor doctor is every two weeks I go in and I
9   have a needle about this big (indicating), as big as
10  my forearm, that is -- I get instructions.  I'll be
11  getting instructions -- well, I've been getting them
12  every six weeks.  But because my pain has been so
13  high, they told me to start going in every two weeks
14  to have the injections.
15           So that medicine there is a
16  steroid, a nerve block, and some other stuff is
17  used.  So that's the internal medicines that go in.
18      Q.   Okay.
19      A.   And --
20      Q.   Are these -- I'm sorry to cut you off.
21  Are these all the pain medications that you're
22  currently taking?
23      A.   Yes.
24      Q.   Okay.
25      A.   Uh-huh.

Page 20

1       Q.   And the pain medication that you're
2   taking specifically to treat your vagina, I believe
3   you mentioned --
4       A.   My pelvic floor area.
5       Q.   Excuse me?
6       A.   My pelvic floor area.
7       Q.   Your pelvic floor?
8       A.   To treat my pelvic floor.
9       Q.   Okay.  Thank you.
10           Were those prescribed by
11  Dr. Gerig?
12      A.   Yes.
13      Q.   Okay.
14      A.   And also I take Zofran.  Because when I
15  have a -- a pain threshold that I can't get over,
16  you know, I have to take more medication.  But then
17  it's a chain reaction, where that medication makes
18  me nauseous, so then I have to take Zofran.  So
19  that's also a medication.
20      Q.   Okay.  Now, the first list of medications
21  that you mentioned, I believe -- and I did my best
22  to write them down, but I may have missed some.  But
23  I think it included Percocet, the gaba --
24      A.   Gabapentin.
25      Q.   Gabapentin, Ibuprofen, Valium.  I think,

Page 21

1   was it, hydrophenten or hydrocodone?
2       A.   It's like hyoscyamine, something like
3   that.
4       Q.   And then I think you said Apripol?
5       A.   Yeah.
6       Q.   So that -- I'm sorry.  Go ahead.
7       A.   Uh-huh.  Apripol.  I think that's what it
8   is.
9       Q.   I'm not -- this isn't meant to be a
10  memory test.  I understand that it's difficult to
11  remember some of these, so you're doing a great job.
12           Just what I was getting at is a
13  couple things.  Are those all medications that
14  you're taking specifically to treat, at least to
15  your understanding, pain related to your pelvic
16  floor area or your vagina?
17      A.   Yes.
18      Q.   Who prescribed those medications to you,
19  to the best of your knowledge?
20      A.   Dr. Gerig, she is with Pelvic Floor
21  Solutions, and Carrie Reynolds, who is her nurse
22  practitioner.
23      Q.   And those medications, would you
24  typically take those every single day?
25      A.   When pain is there, yes.  But what I try

Katrina Bagwell

Page 22

1 to do when I do not take the medications -- like,
2 have you ever taken Percocet for a long time?  You
3 get constipated really bad.  And for me to get
4 constipated is horrible in my pelvic floor.  It's
5 horrible.  It is so painful.  So I try my best not
6 to take my pain meds.
7     Q.   I understand.
8     A.   But I have to.
9     Q.   And we can take a break if you need --
10         MR. THORNBURGH:  That's okay.
11    Q.   -- a minute.
12         MR. THORNBURGH:  That's okay.
13    A.   It's a vicious cycle with all the meds I
14 take.
15    Q.   I understand.  So with your pain
16 medications, you -- I just want to make sure I'm
17 understanding your testimony correctly.  With the
18 pain medications that you've listed, you take them
19 as needed, but as frequently as every day?
20    A.   Yeah.  I can't -- like, some pain meds I
21 can't stop.
22    Q.   Do you know which --
23    A.   But I have this whole box.  This whole
24 box is full of all my tools that I use every day to
25 get through my day.

Page 23

1     Q.   And we'll go through -- we'll go through
2 the box, and I -- do the pain medications that you
3 take, do they help relieve your pain?
4     A.   Sometimes.
5     Q.   Okay.  And I noticed you're standing here
6 during today's deposition.  Is that because you're
7 currently in pain?
8     A.   Yes.  I can't sit because it causes so
9 much pain.
10    Q.   When you're -- when you're taking your
11 pain medications, are you able to sit?
12    A.   No.
13    Q.   In general, are you unable to sit?
14    A.   I can sit, but I slouch.
15    Q.   I understand.
16    A.   And the problem with when I sit is it
17 just causes pain after.  Like, think of how many
18 times you sit a day.  How many times do you bend
19 over a day, or hop, skip, jump, run?  I can't do any
20 of those things because it causes so much pain.
21    Q.   Okay.  I understand.  Well, you're doing
22 a great job during today's deposition today, and we
23 appreciate you being here with us.
24         Let me -- are there any other
25 reasons today that you'll be unable to provide

Page 24

1 truthful or accurate testimony or that will affect
2 your ability to provide testimony here today?
3     A.   No.
4     Q.   Okay.  I want to switch gears a little
5 bit and ask you what you did to prepare for today's
6 deposition.
7         But before I do that.  I
8 understand that you likely met with your lawyers,
9 and I don't want to -- I don't want the substance of
10 any conversations that you had with your lawyers.
11 It's okay to tell me that you met with them, but I
12 don't want to know any of the discussions.
13         So with that caveat, let me ask
14 you:  What did you do to prepare for today's
15 deposition today?
16    A.   What did I do?  I got stressed out.  I'm
17 so stressed.  I'm so nervous.
18    Q.   Did you meet with your lawyers?
19    A.   Yes.
20    Q.   When did you meet with your lawyers?
21    A.   Yesterday.
22    Q.   Okay.  And about how long did the meeting
23 last?
24    A.   It was, like, an afternoon.
25    Q.   Did you review any documents during the

Page 25

1 meeting?
2     A.   Things that I brought to him.
3     Q.   So the things that you brought to the
4 deposition here today?
5     A.   Yes.
6     Q.   Did you review anything, any documents
7 other than the ones that you've brought to the
8 deposition here today?
9     A.   You have them all, yeah.
10    Q.   I have them, we have them all here at the
11 deposition today?
12    A.   Uh-huh.
13    Q.   That's a yes?
14    A.   Yes.
15    Q.   Thank you.
16         Prior to yesterday's meeting, did
17 you have any other meetings with your attorneys to
18 prepare for today's deposition?
19         MR. THORNBURGH:  Objection.  Form.
20 Anything with respect to meetings.
21         Go ahead.
22    Q.   You can answer.  Prior to -- let me ask
23 it again.
24         Prior to yesterday's meeting, did
25 you meet with your attorneys at any other point to

Katrina Bagwell

Page 26

1 prepare for today's deposition.
2         MR. THORNBURGH:  Same objection.
3             Go ahead.
4     A.    Objection.
5         THE WITNESS:  Do I say objection?
6         MR. THORNBURGH:  No.  No.  No.
7     Q.    The objections are purely for the court
8 and the attorneys to sort out.
9         MR. THORNBURGH:  You can answer it if
10 you have an answer to that question.  I'm just
11 objecting to the way he asked it.
12         THE WITNESS:  Oh.
13         MR. THORNBURGH:  But that's for
14 something later the court will decide.  It's
15 nothing -- you'll still have to answer the
16 questions, unless I instruct you not to, okay?  So
17 even if I object, you still need to answer.
18         THE WITNESS:  Oh, okay.
19     A.    So, like, did we meet?  Have we ever met
20 before?  I just met him yesterday for the first
21 time.
22     Q.    Okay.  Other than your attorneys, was
23 anyone else present in the meeting?
24     A.    My husband, Luke Bagwell.
25     Q.    Anyone other than your husband and your

Page 27

1 attorneys?
2     A.    No.
3     Q.    Did you consult with anyone other than
4 your husband or your attorneys to prepare for
5 today's deposition?
6     A.    No.
7     Q.    Did you take any notes in advance of
8 today's deposition or to prepare for it?
9     A.    No.  Just thinking about things that are
10 happening made me nervous, so no.
11     Q.    So mental notes, but nothing written; is
12 that fair?
13     A.    Correct.
14     Q.    Okay.
15         (Exhibit No. 1 was marked.)
16     Q.    I'm going to hand you what has been
17 marked as Exhibit 1.
18         MR. THORNBURGH:  I don't need a copy.
19 Thank you.
20         MR. ANWAR:  Yeah.
21     Q.    I'm just going to represent to you that
22 this is just a document, a legal document, the
23 notice that scheduled your deposition here today.
24         If you could turn to the third
25 page of the document.

Page 28

1     A.    Schedule A?
2     Q.    Correct.  There is a list of requests
3 there for a number of items and documents.  Did you
4 have an opportunity to review that list before
5 today's deposition?
6     A.    Yes.
7     Q.    Okay.  And were you able to search
8 whether you have responsive documents or materials
9 responsive to these requests?
10         MR. THORNBURGH:  Objection.  I think
11 we also filed objections to some of those requests.
12         MR. ANWAR:  That's fine.
13     Q.    The question is:  Were you able to -- did
14 you make an attempt to see if you have any of the
15 documents or items that were requested in
16 Schedule A?
17     A.    Yes.  I brought them.
18     Q.    Okay.
19     A.    You have them.
20     Q.    And that's what I was getting at.  That's
21 what you brought here today with you, correct?
22     A.    Yes.
23     Q.    We won't spend a ton of time on these at
24 this very moment, but I just wanted to quickly go
25 through and mark them for the record with you.

Page 29

1         Let's go ahead and mark this
2 document as Exhibit --
3         MR. ANWAR:  Is it okay to mark this?
4         MR. THORNBURGH:  Yeah.  Yeah.  I'm
5 sorry, we were just...
6         MR. ANWAR:  Okay.
7         (Exhibit No. 2 was marked.)
8     Q.    I'm handing you what's been marked as
9 Exhibit 2.
10     A.    Yes.
11     Q.    Can you tell me what that is?
12     A.    This is the Boston Scientific brochure
13 about -- talking about the bladder sling.
14     Q.    And I noticed that there's some, like,
15 Bates, legal numbering at the bottom right-hand
16 corner.  Is this a document that you actually had at
17 home and you brought?
18     A.    Yes.
19     Q.    You had it at home?
20     A.    This is the document that I received.
21     Q.    Okay.  I understand.
22         And is this a brochure that you
23 received from your physicians?
24     A.    Correct.
25     Q.    Which physician was it?

Katrina Bagwell

Page 30

1    A.   Dr. Cowles.
2    Q.   We can go over that later.
3         (Exhibit No. 3 was marked.)
4    Q.   I'm handing you what has been marked as
5 Exhibit 3.  These are some photographs that you
6 brought today.  Can you tell me what those are?
7    A.   The first photo is -- this is my foot
8 right here (indicating), and this is a tray and the
9 glove and this is the needle.  See how long it is?
10   Q.   Yes.
11   A.   This is what is part of my care plan,
12 where I get injections inside my vagina.
13   Q.   So are those pictures of -- that the
14 injections that you mentioned as part of your pelvic
15 floor plan?
16   A.   Yes.
17   Q.   Okay.  And specifically, that's a picture
18 of the needle and then your foot as you're -- as
19 you're sort of laying there to be injected.  Is that
20 a fair characterization?
21   A.   Correct.
22   Q.   And then what is the second picture?
23   A.   The second picture is of a tool that is
24 used.  That guides this needle into my vagina to hit
25 the spot where they inject the nerve block and the

Page 31

1 steroid.
2    Q.   I understand.  So those are just pictures
3 related to the injections you receive as treatment
4 for your pelvic floor plan?
5    A.   Correct.
6    Q.   Thank you.
7         (Exhibit No. 4 was marked.)
8    Q.   I'm going to hand you what is being
9 marked as Exhibit 4.  Can you tell me what those
10 are?
11        MR. THORNBURGH:  I think he's just
12 looking for a general description of what you have
13 there.
14   Q.   And I'll just tell you.  I took a quick
15 look at them.  I didn't have a chance to read
16 through them in detail yet, but they look like --
17   A.   Can I read them to you then?
18   Q.   We will later in the deposition go
19 through the letters.  I just wanted to quickly sort
20 of take inventory of everything that you brought to
21 today's deposition.
22        Are those letters from your family
23 members?
24   A.   Correct.
25   Q.   And sort of generally, can you just tell

Page 32

1 me what the letters contain or what the purpose of
2 the letters from your family members are?  And
3 maybe --
4         MR. THORNBURGH:  Just give her a
5 moment.  She's going to answer your question.
6         MR. ANWAR:  That's fair.
7         MR. THORNBURGH:  Just give her a
8 moment.
9    A.   Yes, these are letters that are from my
10 family because they're a part of this as well.
11 They've been hurt by this as well.  And they want to
12 express their feelings, so they wrote letters.
13        And when they wrote them, I
14 thought that my children would only write a sentence
15 or two, but they wrote letters to explain what they
16 go through because of my suffering, because of what
17 I'm going through.
18   Q.   So would it be fair to say those are --
19 are those letters that your family wrote to express
20 their feelings to you about sort of the injuries
21 that you're -- the injuries and the lawsuit and how
22 it's affected them?
23   A.   They're expressing how my daily living
24 has affected them.  Like, my son, he's in special
25 forces in the Air Force, and he talks about how all

Page 33

1 of his missions are nothing compared to what I am
2 going through.
3    Q.   Okay.
4    A.   That's a lot, and he goes to a lot of
5 dangerous places.
6    Q.   I understand.  And we'll later in the
7 deposition try to take some time to go through the
8 letters in detail.  I appreciate you bringing those
9 for us here today.
10        With respect to the pictures and
11 the brochure and the letters, are those to the best
12 of your knowledge, like, the original versions of
13 the documents that you're bringing here, true and
14 accurate copies of the documents that you're
15 bringing?
16   A.   Yes.
17   Q.   Thank you.  I am going to mark as an
18 exhibit --
19        MR. THORNBURGH:  I may have a
20 paperclip to help you out.
21        MS. LUCIUS:  Here you go.
22        MR. THORNBURGH:  That's better.
23 Thank you.
24        THE WITNESS:  Can I just get a drink?
25        MR. ANWAR:  Sure.  Let's take a quick

Katrina Bagwell

Page 34

1 break.
2        (Break from 10:48 a.m. to
3        10:52 a.m.)
4 BY MR. ANWAR:
5    Q.   Mrs. Bagwell, you're doing great, and I
6 know this is probably a difficult topic to talk
7 about for you.  So if at any time you do need to
8 take additional breaks, just let me know and we're
9 happy to accommodate you.
10        (Exhibit No. 5 was marked.)
11    Q.   I'm going to hand you what has been
12 marked as Exhibit 5.  This looks like, to me at
13 least, and you can correct me if I'm wrong, a stack
14 of documents that you brought, and they look like
15 pharmacy records; is that correct?
16    A.   Yes.  All of my updated information from
17 within just a month, of just recent.
18    Q.   So that stack of documents that's been
19 marked as Exhibit 5, those are sort of all of your
20 records and related to your treatment from within
21 the past month?
22    A.   Correct.
23    Q.   Thank you.
24    A.   And all the medications.
25    Q.   And, I'm sorry, what was the last one?

Page 35

1    A.   All the medications.
2    Q.   Okay.  I understand.
3        MR. THORNBURGH:  And just for the
4 record, I think it's more than just pharmacy
5 records.
6        MR. ANWAR:  Okay.
7        THE WITNESS:  Yeah.
8    Q.   So let's keep it clear.  It's medical
9 records and pharmacy records; is that fair?
10    A.   Receipts as well.
11    Q.   And receipts that you've related to
12 expenses you've incurred for the medical treatment
13 and pharmacy records?
14    A.   Just for one month, yes.
15    Q.   Understood.  And that's for the last
16 month?
17    A.   Yes.
18    Q.   Okay.  I'm going to mark this as
19 Exhibit 6.
20        (Exhibit No. 6 was marked.)
21    Q.   I'm handing you what's been marked as
22 Exhibit 6.  It's a thumb drive that you brought here
23 today.  Can you tell us what's on that thumb drive?
24    A.   On this thumb drive is a video, and on
25 the video is what I call Torture Tuesday.  Because

Page 36

1 every Tuesday I go into PT, and when people think of
2 PT, like, you get -- you go in and you get better
3 and you get -- they help you to -- like, you think
4 of exercise and reconditioning, but for me it's not.
5 It's a different kind of PT, where she goes in
6 internally and she massages the tissue to help me
7 get through the week.
8        And it's also dry needling.  I get
9 dry needling as well.  And it's needles that are
10 about this long (indicating) that go into me to
11 relieve the muscles in my pelvic floor.
12    Q.   So are those -- are those videos of the
13 pelvic floor therapy that you've been receiving?
14    A.   With Patty McCord.  And this is just a
15 portion of what I receive.
16    Q.   I understand.  Thank you.
17    A.   And it should be labeled Torture Tuesday.
18        (Exhibit No. 7 was marked.)
19    Q.   I'm marking as Exhibit 7, it's a blue
20 folder containing documents.  And on top of the blue
21 folder that has your name, Katrina Bagwell, and it
22 says Evergreen Physical Therapy; is that correct?
23    A.   That is correct.
24    Q.   Could you tell me what Exhibit 7 is?
25    A.   Exhibit 7 is many exercises and stretches

Page 37

1 that I incorporate in my daily living.  And also
2 inside is different sex positions because
3 intercourse is a challenge, and so Patty McCord is
4 wonderful and she always researches stuff and looks
5 up stuff for me and gives me tools to use such as
6 this to help me.
7    Q.   I understand.  And so Patty McCord, she's
8 the physical therapist that you're seeing?
9    A.   Correct.
10    Q.   And she's the physical therapist that's
11 performing the pelvic floor exercises?
12    A.   Correct.
13    Q.   And is she at Evergreen Physical Therapy?
14    A.   Correct.
15    Q.   And where is Evergreen Physical Therapy
16 located, do you know?
17    A.   In Colorado.
18    Q.   I just meant the city, if you know the
19 city?
20    A.   Evergreen.
21    Q.   I'm sorry.  That was probably a dumb
22 question on my part.
23        And then the actual pelvic floor
24 exercises that you -- that she's helping you with,
25 were those prescribed by Dr. Gerig?

Katrina Bagwell

Page 38

1    A.   Yes.
2    Q.   Okay.
3    A.   And also by Dr. Flynn.
4    Q.   I understand.
5    A.   Because I've been seeing Patty McCord
6  since 2014.  In the beginning I was seeing her three
7  times a week.  I was going three times a week to PT.
8          My drive to physical therapy is
9  one hour.  That drive for me is horrible because I
10  live on a mountain road, there and back.  The
11  thought process when I go to PT and thinking of what
12  I'm going through is horrible.
13          Also in this folder is what my
14  psychologist gave me, because we tried everything.
15  We -- because I have -- I have pain so bad that they
16  give me many tools to try to use at home.  And so
17  this folder has a lot of those tools.
18    Q.   And so just to be clear, so that
19  Exhibit 7, that blue folder that you brought to the
20  deposition and we've marked as Exhibit 7, does that
21  contain just records related to the pelvic floor
22  physical therapy that you've been receiving
23  treatment for?
24    A.   This is just a portion of it.  This is a
25  small portion of what I receive.

Page 39

1    Q.   Okay.  It's some of the records; is that
2  fair?
3    A.   Yes.
4    Q.   Okay.  And you mentioned that you've been
5  receiving pelvic floor physical therapy since 2014;
6  is that correct?
7    A.   Correct.
8    Q.   And you -- I think you stated that when
9  you first started, you were going three times a
10  week?
11    A.   Three times a week.
12    Q.   Okay.
13    A.   Because I was in so much pain.
14    Q.   Are you still going to -- are you still
15  receiving pelvic floor therapy?
16    A.   So I was going three times a week, and
17  then it went down to two times a week, and now I go
18  every week.  And that one day a week is Tuesday,
19  Torture Tuesday.
20    Q.   Do you remember, sort of, roughly, the
21  time frame that you went from three times a week to
22  two times a week?
23    A.   So after my second surgery, it stayed
24  three times a week for a long time and then I think
25  maybe a year or so after.  And then it went to two

Page 40

1  times a week, and then a year or so after that then
2  it went to one time a week.
3    Q.   And when you're referring to your second
4  surgery, are you referring to the second surgery
5  performed by Dr. Flynn, Brian Flynn?
6    A.   Correct.
7    Q.   So the second surgery to remove mesh from
8  your body; is that correct?
9    A.   Correct.
10    Q.   And I have the date sort of jotted down
11  for that is roughly September 2014.  Does that sound
12  right to you?
13    A.   Yes.
14    Q.   So following that surgery, for about a
15  year or so -- and I'm not going to hold you to
16  specific dates.  But roughly about a year or so
17  after that September 2014 surgery, you were
18  receiving pelvic floor therapy for about three times
19  a week, correct?
20    A.   Correct.
21    Q.   And then after that point it went --
22  after a year or so it went down to about two times a
23  week; is that correct?
24    A.   Correct.
25    Q.   So that would be roughly, like, late 2015

Page 41

1  time frame.  Does that sound about right?  Maybe
2  early 2016?
3    A.   Somewhere, I think so.  But everything's
4  in front of you.  Every single -- every single visit
5  I had, the treatment that she did, everything is
6  right there in the folders next to you, and it shows
7  how frequent I went.
8    Q.   And I understand.  And we will
9  certainly -- we certainly have your records and
10  we'll, you know, go through those in detail in the
11  lawsuit.  Just for right now I'm trying to get your
12  best recollection.
13          And then I think you said about a
14  year or so after it went down to two times a week,
15  your physical therapy went down to about one time a
16  week; is that fair?
17    A.   Yes.
18    Q.   Okay.
19    A.   But also I want to include that Patty
20  McCord has given me her personal number because she
21  knows what pain that I go through.  She knows what
22  to do to relieve that.  And so I could call her on
23  the weekend, I could call her after hours, like I've
24  had to, and I say, "Patty, I'm in so much pain."
25  And she says, "Come on in."  And we take the drive,

Katrina Bagwell

Page 42

1 and she's there for me.
2    Q.   I understand.  And so roughly -- again,
3 I'm not going to hold you to dates.  I realize we
4 have the records and some time has passed.  But
5 would it be fair to say around late 2016, early 2017
6 time frame is when your physical therapy got reduced
7 to about one time a week?
8    A.   Yes.
9    Q.   And is that currently -- that's currently
10 the frequency with which you receive physical
11 therapy?
12    A.   One time a week, and then if I have
13 really bad pain I call her.  So sometimes it's more.
14    Q.   And, for the record, just so I'm clear.
15 When I'm referring to the physical therapy, I mean
16 the pelvic floor therapy.
17         Let's finish going through these
18 real quick.
19         MR. THORNBURGH:  Can we move
20 Exhibit --
21         MR. ANWAR:  7.
22         MR. THORNBURGH:  -- 7 to the side?
23         MR. ANWAR:  Sure.  Absolutely.
24         MR. THORNBURGH:  I'm trying to
25 organize this.  Did you not mark the letters?  There

Page 43

1 it is.  Should we mark the outside of the envelope?
2         MR. ANWAR:  Sure.  We can figure that
3 out.
4    Q.   So the last thing I'm going to mark, I'm
5 marking as Exhibit 8.  And we don't have to, at
6 least at this point in the deposition, spend time
7 going through all of these quite yet.
8         (Exhibit No. 8 was marked.)
9    Q.   Exhibit 8, to me, appears to be a stack
10 of medical records, billing records related to your
11 treatment?
12    A.   Can I take them out?
13    Q.   You can if you'd like, if you need to
14 look at them.
15         My question to you is simply is
16 that correct?  Are these medical records, billing
17 records related to your treatment related to the
18 injuries you're claiming in the lawsuit, the pelvic
19 issues that you've experienced?
20    A.   Yes.  And they're also personal documents
21 that I have written.
22    Q.   Okay.
23    A.   Just, like, kind of little journal stuff.
24 And a wrote a letter to Dr. Flynn because I was
25 really scared about the surgery he was performing on

Page 44

1 me, and I just wrote a letter to let him know that I
2 trust him.
3    Q.   I understand.  So the --
4    A.   And then I have letters that talk about
5 my pain and stuff that I go through in a day.
6    Q.   So that --
7         MR. THORNBURGH:  She's answering your
8 question.  You had represented that it was just
9 medical records and billing records, and so she's
10 trying to describe the things that are in addition
11 to those items.
12         MR. ANWAR:  No, I understand that,
13 and I appreciate that clarification.
14         MR. THORNBURGH:  So I would just
15 appreciate that you make sure she's done responding
16 to that last question before you go on to the next
17 one.
18         MR. ANWAR:  And we will do that.  And
19 again, I would appreciate it if you would just limit
20 the speaking objections in general.
21         MR. THORNBURGH:  Make sure --
22         MR. ANWAR:  She had stopped speaking,
23 so I had continued.
24    Q.   But, Mrs. Bagwell, are there -- is there
25 anything else contained within Exhibit 8, besides

Page 45

1 medical records, billing records, and sort of the
2 notes and journals that you referenced?
3    A.   All of that is here.
4    Q.   Is there anything else that we haven't
5 discussed, anything besides medical records, billing
6 records, and then your notes and your journals?
7    A.   No.
8    Q.   Okay.  Thank you.  You can set that
9 aside.  I appreciate you bringing all of that to the
10 deposition.
11         MR. THORNBURGH:  And, for the record,
12 a lot of these things, a lot of the medical records
13 were probably already produced.
14         MR. ANWAR:  Okay.
15         MR. THORNBURGH:  But out of an
16 abundance of caution.
17    Q.   So I want to switch gears a little bit,
18 Mrs. Bagwell, and just ask you a few general sort of
19 background questions.
20         What's your current home address?
21    A.   111 Bandit, B-a-n-d-i-t, Lane in Bailey,
22 Colorado, 80421.
23    Q.   How long have you lived there?
24    A.   Five years.
25    Q.   Who lives there with you?

Katrina Bagwell

Page 46

1    A.    My husband, Luke Bagwell, and my son,
2  Alaric Bagwell.
3    Q.    And then I'm looking at the Fact Sheet
4  provided, that you submitted in the lawsuit.
5          Before your current address, did
6  you live at the address in Lakewood, Colorado?
7    A.    Yes.
8    Q.    Okay.  That's 9365 West Kentucky Avenue?
9    A.    Yes.
10   Q.    Okay.  And that was roughly from 2010 to
11 2013 time frame?  Does that sound right?
12   A.    Yes.
13   Q.    Okay.  Before the West Kentucky Avenue
14 address in Lakewood, Colorado did you live at
15 Lakewood Towers at Belmar Apartments?
16   A.    Yes.
17   Q.    And that was also in Lakewood, Colorado?
18   A.    Yes.
19   Q.    And before that address, the Lakewood
20 Towers address -- well, let me back up.
21        You lived at the Lakewood Towers
22 address from roughly 2007 to 2010.  Does that sound
23 about right?
24   A.    Yes.
25   Q.    And then before then did you live in

Page 47

1  Kissimmee, Florida?
2    A.    Yes.
3    Q.    And that was, roughly, from 2004 to 2007?
4    A.    Yes.
5    Q.    At 117 Herring Way?
6    A.    Yes.
7    Q.    And then from 2000 to 2004 you lived at
8  9365 West Dakota in Lakewood, Colorado; is that
9  fair?
10   A.    Yes.
11   Q.    You mentioned, I think, one of your
12 children.  I wanted to ask you, how many children do
13 you have?
14   A.    Five.
15   Q.    And what are their names?
16   A.    Adalicia, Annamarie, Joseph, Zackary, and
17 Alaric.
18   Q.    Are those all your biological children?
19   A.    Yes.
20   Q.    And I don't mean this to be a quiz or
21 test or anything, but can you tell me roughly how
22 old each one of your children are?
23   A.    Ada's 30, Joseph's 25 -- or Annamarie's
24 27, Joseph's 25, Zackary's 20, and Alaric is 11.
25   Q.    And Ada, you said Ada.  Is her full

Page 48

1  name --
2    A.    Adalicia.
3    Q.    -- Adalicia Leray Rael?
4    A.    Yes.
5    Q.    Okay.  And does she currently live in
6  New Hampshire?
7    A.    Yes.
8    Q.    At the address listed --
9    A.    Yes.
10   Q.    -- that you provided previously?
11        Annamarie Rose Rael?
12   A.    Yes.
13   Q.    That's your daughter, correct?
14   A.    Yes.
15   Q.    And she lives in Colorado Springs,
16 Colorado?
17   A.    Yes.
18   Q.    Joseph Raley Rael, does he live in
19 Crestwood, Florida?
20   A.    Yes.
21   Q.    And that's your son?
22   A.    Yes.
23   Q.    And then Zackary William Rael, that's
24 also your son.  He lives in Lakewood, Colorado?
25   A.    Yes.

Page 49

1    Q.    And then Alaric Luke Bagwell, he lives in
2  Bailey, Colorado, correct?
3    A.    Yes.
4    Q.    And he's your youngest son, correct?
5    A.    Yes.
6    Q.    And he lives with you, correct?
7    A.    Correct.
8        MR. THORNBURGH:  Just for the record,
9  one or more of her children will likely testify live
10 at trial.  And as we discussed earlier, we'll give
11 you an opportunity to depose them prior to trial.
12 But we'll work that out later.
13        MR. ANWAR:  Understood.  Thank you.
14   Q.    Were -- were any of your children, were
15 they natural, vaginal birth?
16   A.    They were all cesarean section.
17   Q.    Is there a reason they were, do you know,
18 that they were all cesarean sections?
19        MR. THORNBURGH:  Objection.  Form.
20   Q.    You can answer.
21   A.    Two of my first children I tried to have
22 vaginally, but I could not because their heart rate
23 dropped.  And so for the next births that I had
24 they, the doctors, just automatically said no
25 vaginal births, no VBACs.  You have to have a

Katrina Bagwell

Page 50

1 cesarean section.
2    Q.   Do you know why you had trouble giving
3 vaginal birth with your first two children?
4         MR. THORNBURGH:  Objection.
5    A.   No.
6    Q.   Did you say it caused pain?  I'm sorry,
7 that's a silly question.
8         MR. THORNBURGH:  Objection.  Move to
9 strike.
10   Q.   You mentioned that you had -- you had
11 issues giving vaginal births with your first two
12 children, correct?
13   A.   Correct.
14   Q.   Okay.  And was there a specific -- did
15 the doctors tell you a specific reason why you were
16 having issues giving vaginal birth?
17   A.   No.  Just, I guess, because I'm small.  I
18 don't know.
19        You know, the children's heart
20 rate dropped and they could have died.
21   Q.   Okay.
22   A.   And so the fear.  My understanding was no
23 more C-sections.  We don't want -- because -- yeah.
24 It's dangerous when they come out not breathing.
25   Q.   Absolutely.  Do you have any

Page 51

1 understanding why their heart rates dropped?
2         MR. THORNBURGH:  Objection.
3    Q.   You mentioned because you're small.  Did
4 it relate to your size in relation to them, to the
5 children?
6         MR. THORNBURGH:  Objection.
7    Q.   And you can answer I don't know if you
8 don't know.
9    A.   I don't know.
10   Q.   Okay.  Are you recurrently married?
11   A.   Yes.
12   Q.   Who is your husband?
13   A.   Luke Dave Bagwell.
14   Q.   How long have you been married to Luke
15 Bagwell?
16   A.   We have been married since 2007.
17   Q.   Do you have any prior marriages?
18   A.   Yes.
19   Q.   Who were you married to before?
20   A.   Raley Joseph Rael.
21   Q.   And roughly, like, what was the time
22 frame for that marriage?
23   A.   From 1987 to about 2003 or '4.
24   Q.   And I noticed that with four of your
25 children, Adalicia, Annamarie, Joseph, and Zackary,

Page 52

1 they all have the last name Rael.  So is it fair to
2 say those are all children from your prior marriage?
3    A.   Yes.
4    Q.   And then Alaric is your son from your
5 current marriage with Luke?
6    A.   Yes.
7    Q.   Okay.  Where did you go to high school?
8    A.   Skyline High School in Longmont,
9 Colorado.
10   Q.   Did you graduate?
11   A.   Yes.
12   Q.   Did you go on to attend college after
13 high school?
14   A.   Yes.
15   Q.   Where did you go to college?
16   A.   California at MiraCosta College.
17   Q.   And what did you study there?
18   A.   I was getting into nursing, but I
19 obtained my certified nurse assistant there.
20   Q.   Did you finish, complete that program?
21   A.   Yes, I did.
22   Q.   Was that a one-year program?
23   A.   No.  It was -- it's maybe four or five
24 months.
25   Q.   I understand.  So you -- on your Fact

Page 53

1 Sheet it lists 1989 as the date of attendance; is
2 that correct?
3    A.   Correct.
4    Q.   Did you attend any other colleges?
5    A.   I attended Red Rocks Community College in
6 Golden, Colorado.
7    Q.   And what did you study there?
8    A.   I was getting into nursing, and I was
9 getting into getting my CAC, which is a certified
10 addiction counselor.  But I did obtain my CNA,
11 certified nurse assistant.
12   Q.   Is that different than the degree you
13 received or the certification you received from
14 MiraCosta College?
15   A.   It's the same.  But Colorado has
16 different laws, so I had to redo the course here in
17 Colorado to get my certification.
18   Q.   I understand.  And so the nursing
19 assistant program that you attended at Red Rocks
20 Community College, did you -- did you complete that
21 in 2002?
22   A.   I think it was around there.  I think.
23   Q.   And I'll represent that's what's listed
24 in your Fact Sheet.
25   A.   Yeah.

Katrina Bagwell

Page 54

1    Q.   So do you have any reason to disagree
2  with that?
3    A.   No.
4    Q.   Okay.  And was that roughly, like, a
5  six-month program, a six month to a year program as
6  well?
7    A.   I think it was just about six months.
8  And it --
9    Q.   And -- I'm sorry.
10    A.   It wasn't that long, a year.
11    Q.   And did you complete that program?
12    A.   Yes.
13    Q.   Any other college or educational courses
14  that you've taken or colleges that you attended?
15    A.   No.
16    Q.   Are you currently employed?
17    A.   No.
18    Q.   When was the last time you were employed?
19    A.   My last day of work was April 10th -- or
20  April 9th of 2014.  That was my last day of work.
21  Because on April 10th I had the surgery.
22    Q.   Where were you employed at that time?
23    A.   At Lutheran Medical Center, and it's
24  called Sisters of Charity of Leavenworth.
25    Q.   What was your job title or your role

Page 55

1  there?
2    A.   I worked in the nurse float pool as a
3  certified nurse assistant, and I would float to all
4  the floors that were short staffed, from ER to mom
5  and baby to triage to orthopedics.  I worked every
6  floor.
7    Q.   Okay.
8    A.   To hospice, to geriatric psych.  Which
9  I -- when I left, I was trying to obtain the CAC
10  certification so that I could go into the geriatric
11  psych unit at Lutheran Medical Center.
12    Q.   How long did you work at Lutheran Medical
13  Center?
14    A.   About eight years.
15    Q.   Roughly, like, 2007 to 2014 time frame?
16    A.   Correct.
17    Q.   And what were your hours like there?
18    A.   I worked three 12 shifts, three -- three
19  12s.  And I always worked the weekends because the
20  weekends paid more, so it was Friday, Saturday,
21  Sunday, three 12s.
22    Q.   When you say three 12s, you mean three
23  days at 12 hours a shift?
24    A.   Yes.
25    Q.   So it was typical for you to work 36

Page 56

1  hours in a week?
2    A.   Correct.
3    Q.   Okay.  On your Fact Sheet it lists that
4  you were compensated at $25 an hour?
5    A.   Correct.
6    Q.   Why did you end up leaving in April of
7  2014?
8    A.   Because I had a surgery performed from
9  Dr. Flynn to remove the mesh.
10    Q.   And so that surgery is the first surgery
11  that Dr. Flynn performed to remove mesh from your
12  body; is that correct?
13    A.   That is correct.
14    Q.   And the surgery, I think you stated, but
15  was April 10, 2014?
16    A.   Correct.
17    Q.   Did -- are you okay to continue?
18    A.   Uh-huh.
19    Q.   Okay.  You chose to leave that position
20  sort of voluntarily, or were you asked to leave
21  because of physical limitations that were placed on
22  you?
23    A.   Correct.
24    Q.   Which one is correct?
25    A.   Well, I was working, and so I took leave

Page 57

1  to -- I took what they call FMLA.  I took leave to
2  have the surgery.  And Lutheran was wonderful.  They
3  worked with me.  They wanted to keep me on because
4  I'm such a good employee, you know.
5         So after I had the surgery I
6  couldn't return to work, because being a certified
7  nurse assistant you have to be 100 percent when
8  you're taking care of patients.  And, unfortunately,
9  I wasn't at 100 because I was dealing with so much
10  pain.
11    Q.   So I think you mentioned the last day
12  that you worked was April 9, 2010, correct?
13    A.   Correct.
14    Q.   Okay.  At that time had you made the
15  decision to leave your job?
16    A.   Well, I didn't leave it.  It was my job
17  was still there.  They let me know that after --
18  "Oh, after your surgery, you know, come back.  Your
19  job is still here."  Because I was on the FMLA.
20         And FMLA you're only allowed 12
21  weeks out of the year to take, and I exceeded that
22  time of 12 weeks.  But my -- my job said, "We're
23  going to extend you even further because hopefully
24  you'll get better and you'll be back with us."
25         But unfortunately I wasn't, so I

Katrina Bagwell

Page 58

1 couldn't go back to work.
2     Q.   Okay.
3     A.   Which I miss.  I miss taking care of
4 people.  I miss -- I miss my co-workers.  I miss my
5 community at the hospital that I had, and it's a big
6 part of my life that's gone.
7     Q.   I understand.  So just to make sure I'm
8 understanding correctly, and we can take a minute if
9 you'd like a minute.
10          Is it your testimony that you
11 ultimately left -- you ultimately ended up leaving
12 your job because of the sort of issues or
13 limitations you were -- you were experiencing after
14 your first mesh removal surgery?
15     A.   I had a call from my supervisor, and she
16 said, "I'm sorry to let you know we held on to your
17 job as long as we could, but unfortunately we have
18 to fill the position."  So then I was let go at that
19 time.
20     Q.   Do you -- I'm sorry to cut you off.
21     A.   And they knew about, you know, I couldn't
22 return to work because I wasn't at 100 percent to
23 take care of patients.
24     Q.   Do you remember sort of roughly when you
25 received that call from your supervisor?

Page 59

1     A.   No.  I'm going to say -- so I know it was
2 after, well after 12 weeks, because they gave me
3 that block of 12 weeks.  And then they gave me an
4 additional, I don't know, maybe six-week block after
5 that.
6          And all the documents are there,
7 the FMLA that I took and the reasons why I took it
8 due to pain, pelvic floor issues.  You know, I had
9 to -- I had to self-cath myself.
10     Q.   I understand.  So ultimately they -- your
11 employer was no longer able to hold on to your job,
12 or that's what they told you, correct?
13     A.   Correct.
14     Q.   And the reason you didn't return to your
15 job, was that because of the sort of complications
16 or issues you were experiencing following the first
17 mesh removal surgery?
18     A.   Correct.
19     Q.   And we'll talk about those issues in more
20 detail a little later in the deposition.  But just
21 generally, could you tell me sort of at a high level
22 what sort of issues you were experiencing that
23 prevented you from going back to your job?
24     A.   Massive pain.
25     Q.   Was it pelvic pain?

Page 60

1     A.   Yes.
2     Q.   And did that -- and that prevented -- did
3 that limit your ability to walk and --
4     A.   I couldn't sit.  I couldn't hop.  I
5 couldn't skip.  I couldn't jump.  If there's a code
6 at the hospital, I couldn't run to it to help that
7 person.  There's many things.  You have to be -- you
8 have to be fast when you work in a hospital.  You're
9 there to save lives.  You're there to save people.
10 And I could not do that.
11     Q.   I understand.
12          Did you ever make a disability or
13 a workers' comp claim after you left that job?
14     A.   I mean, disability claim.  Not workman's
15 comp.
16     Q.   Okay.  I think I saw that reference in
17 your Fact Sheet.
18          Was that related to the symptoms
19 you just described, the pelvic pain?
20          MR. THORNBURGH:  What do you mean by
21 "that"?
22          MR. ANWAR:  I'm sorry.
23     Q.   The disability claim that you made, was
24 that for the pelvic pain that you were experiencing
25 following the first removal surgery?

Page 61

1     A.   It was the disability claim that I filed
2 was due to pelvic pain.
3     Q.   I understand.  Do you remember, like,
4 roughly when you filed that claim?
5     A.   I think I filed it in November of 2014, I
6 think.
7     Q.   Was it granted?
8     A.   Yes, and that was hard.  That was -- you
9 know, they don't just give out disability claims
10 free-nilly to whoever, you know.  They got a lot of
11 documentation from every doctor that I have, and
12 they researched a lot to make that decision.
13     Q.   I understand.
14     A.   And the judge even specifies in the
15 documentation why I am disabled.
16     Q.   Do you remember at the time that you were
17 awarded the disability claim, either late 2014 or
18 sometime in 2015, I think you stated you made the
19 claim in November 2014, how much you were granted in
20 disability?
21     A.   So after the whole disability thing is
22 done, I don't remember because they split it up into
23 different things.  Like, for Alaric it was this
24 whole different formula that they used, and then for
25 me it was, like, a formula that they use.  And I

Katrina Bagwell

Page 62

1  think the amount was 30 something thousand.
2     Q.  30,000?
3     A.  Around there.  I'm not sure.  I think.
4     Q.  In total?
5     A.  Well, no.  Because it's Alaric's thing is
6  different, and I think Alaric was -- I don't know.
7  I don't remember.  Like, I don't remember.
8     Q.  I guess what I was getting at there was
9  did you receive monthly payments for disability, or
10  did they give you sort of a lump sum payment?
11     A.  So what they do is they do the formula,
12  and they retroact from when you file the claim to
13  present, and then you receive it in a lump sum.  And
14  then they make the decision, with their formula that
15  they use, how much I'll get each month.
16          And so each month I receive $1,000
17  and Alaric receives, like, $600.
18     Q.  Why is Alaric receiving disability?
19     A.  I --
20       MR. THORNBURGH:  Objection.
21     Q.  You can answer.
22     A.  I'm not a Social Security expert, but I
23  know that they use formulas.  And because of the
24  child that I care for, that's how they do it.
25     Q.  Okay.  I understand.  I guess what I was

Page 63

1  understanding was -- what I was getting at there was
2  is he receiving disability because of some sort
3  of --
4     A.  Oh, no.
5     Q.  -- issue he has?
6     A.  No.  No.
7     Q.  Okay.  I understand.  Are you still
8  receiving disability payments today?
9     A.  Yes.
10     Q.  In what amount?
11     A.  I think I just said it.
12     Q.  It was $1,000 a month?
13     A.  $1,000 for me and then Alaric is $600.
14     Q.  And is that the amount you've been
15  receiving -- has that amount stayed the same since
16  you were essentially granted disability?
17     A.  Correct.
18       MR. THORNBURGH:  How are you doing?
19  Do you want to take a break?
20       MR. ANWAR:  If you want to -- I can
21  keep going, but if you want to take a quick break,
22  now would be a good place to take a quick break.
23       THE WITNESS:  Okay.  Yes, please.
24       (Break from 11:29 a.m. to
25        11:38 a.m.)

Page 64

1  BY MR. ANWAR:
2     Q.  We are back on the record from a short
3  break.  Mrs. Bagwell, are you okay to continue?
4     A.  Yes.
5     Q.  Okay.  Before I move on, I wanted to jump
6  back to just a couple questions that I missed.
7         First I wanted to ask you, we
8  talked about your children.  You have five children.
9  Do you recall which hospitals they were born in?  Do
10  you know where they were born at?
11     A.  Yes.
12     Q.  Can you tell me?
13     A.  Adalicia was born at Tri-City Medical
14  Center at Irvine, California.  Joseph was born at --
15  oh, God, Joseph was born at a hospital in
16  California.  It slipped my mind.  So Joseph and Anna
17  were both born at the same hospital in Irvine,
18  California.  And Zackary was born at
19  St. Joseph's in Denver, Colorado.  And Alaric was
20  born at Walt Disney World, the Celebration Hospital.
21     Q.  Thank you.  I also --
22     A.  It was Irvine Medical Center.  Joseph and
23  Anna were born at Irvine Medical Center.
24     Q.  Thank you.  You have a much better memory
25  than I would in that situation, which is bad to say.

Page 65

1         The one thing I forgot to take
2  inventory of was, you do have a box of items over
3  there.  And, for the record, if counsel will agree,
4  we can take a few picture of them and just mark them
5  as an exhibit after the deposition.
6         Sort of at a high level, could you
7  just tell me what you brought in the boxes?  And
8  then as we go on in the deposition, they'll be
9  opportunity to sort of talk about some of the stuff
10  in detail.
11     A.  Uh-huh.
12     Q.  So what did you bring in the box that is
13  sitting right there to your right?
14     A.  So in the box is part of my daily living,
15  that these are all the tools that I use to get
16  through my day; which is a heating pad, ice packs,
17  my TENS unit, my cupping, my taping, my Yoga block
18  that I have to have my foot on when I'm a passenger
19  in a car.  So all the tools that I use through the
20  day.
21     Q.  Okay.  Thank you.  And like I said, we'll
22  take some pictures of those and mark those as an
23  exhibit after the deposition or at the end of the
24  deposition.
25         You had -- when we left off we

Katrina Bagwell

1 were talking about your employment with Lutheran
2 Medical Center and then sort of the leaving and
3 being on disability. But where did you work before
4 Lutheran Medical Center?
5     A.   I worked at Walt Disney World.
6     Q.   And what did you do at Walt Disney World?
7     A.   I worked as a customer service
8 representative for the Grand Floridian Hotel at Walt
9 Disney World.
10    Q.   This is the Walt Disney World in Orlando,
11 Florida? Like, the Walt Disney World?
12    A.   Correct.
13    Q.   Was that from, approximately, 2005 to
14 2007?
15    A.   Yes, about.
16    Q.   How much were you paid, approximately?
17    A.   $8 an hour.
18    Q.   Okay. Now, I know you testified earlier
19 that you're not currently working, correct?
20    A.   Correct.
21    Q.   Have any of your physicians told you you
22 can't or you shouldn't go back to work?
23         MR. THORNBURGH: Objection.
24    A.   Well, my doctors had to write letters to
25 the disability judge that stated what their feelings

1 were about my condition. And because of the severe
2 pain and what I go through on a daily basis, I am
3 unable to work, so yes.
4     Q.   Okay. Is --
5         MR. THORNBURGH: I don't know if you
6 heard the last part. She said "so yes."
7         MR. ANWAR: Yes. Thank you.
8         THE WITNESS: Yes.
9     Q.   Since you left your last job at Lutheran
10 Medical Center in 2014, between now and then have
11 you ever tried to go back to work at all in any
12 capacity?
13    A.   No.
14    Q.   Okay.
15    A.   But I have wanted to. In my heart I have
16 wanted to because I have missed working. I miss
17 taking care of people.
18         And my neighbor has Stage 4
19 cancer. And, you know, the family, they knew that I
20 was a CNA and so they asked, "Could you help?" And
21 I can't, and that breaks my heart. Like, I want to
22 help her, but physically I cannot.
23    Q.   I understand. As -- I know you mentioned
24 that your doctors wrote letters to support your
25 disability claim, correct? Is that right?

1     A.   Correct.
2     Q.   Do you remember which doctors wrote
3 those?
4     A.   All of them.
5     Q.   All of them, so Dr. Flynn and Dr. Cowles,
6 Dr. Gerig?
7     A.   Well, no. Those aren't my doctors
8 anymore.
9     Q.   Okay.
10    A.   So it's Dr. Gerig, Carrie Reynolds, Patty
11 McCord, and Christine Bibeau.
12    Q.   Who is Carrie McCord?
13    A.   Carrie Reynolds is a part of the Pelvic
14 Floor Solutions. She is Dr. Gerig's nurse
15 practitioner.
16    Q.   And then who was the last person you
17 mentioned? Was it Bibeau?
18    A.   Christine Bibeau.
19    Q.   Who is she?
20    A.   She's my psychologist.
21    Q.   Okay.
22    A.   And I've been seeing her since 2014 to
23 present. I still see her.
24    Q.   Okay. As it sort of stands today, have
25 any of the doctors that you're seeing, like,

1 affirmatively told you you shouldn't go back to
2 work?
3         MR. THORNBURGH: Can you read that
4 question back.
5         (Record read.)
6         MR. THORNBURGH: Objection. Form and
7 asked and answered.
8     Q.   And I can just clarify the question.
9         So as of today, have any of your
10 doctors affirmatively told you that you shouldn't go
11 back to work?
12    A.   That I shouldn't?
13         MR. THORNBURGH: Objection. Form.
14 Asked and answered.
15    Q.   You can answer.
16    A.   Okay. Well, my doctors, along with
17 myself, we try to stay very positive because they
18 know that I want to go back to work. I work hard
19 every day.
20         So, like, you know, my doctors
21 know what I go through on a daily basis. They know
22 that I cannot go back to work. But we work hard
23 every day to...
24    Q.   And I certainly understand that. I guess
25 just what I wanted to confirm was -- and it sounds

Katrina Bagwell

---

Page 70

1  like to me, and you should correct me if I'm wrong.
2  But as of today there isn't a doctor that has
3  specifically told you, "Mrs. Bagwell, you shouldn't
4  go back to work"?
5          MR. THORNBURGH:  Objection.
6  Mischaracterization.
7          Go ahead.
8      A.   Yeah, because of what I go through.  They
9  know of my pain.  They know of my disability.  They
10 know what I go through on a daily basis.  They know
11 that I cannot go back to work.  But we stay
12 positive, hoping that some day I can.
13     Q.   I understand.  Is there -- I understand
14 that they treat you and they know what you're going
15 through.
16          Has any one of them explicitly
17 said, "I don't think you should go back to work"?
18          MR. THORNBURGH:  Objection.
19     Q.   And it's okay if the answer is no.  I'm
20 just trying to confirm.
21          MR. THORNBURGH:  I think you meant to
22 say I don't know.  You said --
23          MR. ANWAR:  She can respond in
24 whatever way is appropriate.
25          MR. THORNBURGH:  You just --

Page 71

1      Q.   You can answer.
2          MR. THORNBURGH:  You just told her a
3  way to respond.
4      Q.   It's appropriate to say "I don't know."
5  It's appropriate to say "no."  I'm just looking for
6  your response.
7          And my question is just I'd like
8  to confirm that it sounds like -- based on your
9  testimony, it sounds like there isn't a doctor, as
10 it stands today, that has explicitly or
11 affirmatively told you that you shouldn't or can't
12 go back to work?
13          MR. THORNBURGH:  Objection.
14 Mischaracterization.  Asked and answered.
15     Q.   You can answer.
16     A.   Well, all my doctors, including
17 Dr. Flynn, they say look how far you've come.
18 Because I have come so far from the beginning until
19 now.  And we just stay positive in hopes that maybe
20 some day I can go back to work.  I always have that
21 hope, yes.
22          MR. ANWAR:  I will object to that as
23 nonresponsive.
24          MR. THORNBURGH:  We oppose.
25     Q.   Can you just answer --

Page 72

1          MR. THORNBURGH:  She's answered the
2  best way she can, Counsel.
3      Q.   -- in a yes or no, has --
4          MR. THORNBURGH:  If you can answer
5  the question yes or no.  That's the way the rule is.
6  If not, you can explain.
7      Q.   If you need to add context, you can add
8  context.
9          But I'm just asking, yes or no:
10 Have any of your physicians told you as of today
11 that you can't or should not go back to work?
12          MR. THORNBURGH:  Objection.  Asked
13 and answered.
14     A.   I'm going to state again that we all stay
15 positive.
16     Q.   Is that a no?
17          MR. THORNBURGH:  Objection.
18     A.   I think you're trying to put words in my
19 mouth, and that's not right.
20     Q.   If the answer -- and I'm certainly not
21 trying to do that.  If the answer is yes, they have,
22 could you please -- could you identify which --
23 which doctors have told you that?
24     A.   You can see it in their statements.  They
25 wrote a synopsis, each doctor wrote a synopsis about

Page 73

1  my condition and what I am going through.  And in
2  there it states their feelings, their thoughts.
3      Q.   And I understand that.  And I appreciate
4  that you brought the records with you, and so I'm
5  certainly not trying --
6          MR. THORNBURGH:  You've had those
7  records for some time now.
8          MR. ANWAR:  Yeah.  And we've
9  collected the records, and I appreciate that you've
10 given us access to those.
11     Q.   But I guess I'm just asking based on your
12 knowledge, if -- if a doctor has told you that you
13 can't go back to work or should not go back to work,
14 who is that doctor?  And if the answer is I don't
15 know, that's okay.
16          MR. THORNBURGH:  Objection.  She's
17 answered the question the best she can.
18          MR. ANWAR:  She has not answered the
19 question.
20          MR. THORNBURGH:  Three times.  Three
21 times now.
22          MR. ANWAR:  Can you please stop
23 speaking on the record.
24          MR. THORNBURGH:  You have the
25 disability records.

---

Katrina Bagwell

Page 74

1 MR. ANWAR: That's fine, and you can
2 object to form.
3 MR. THORNBURGH: You can depose the
4 doctors. You deposed Dr. Flynn and didn't even ask
5 that question.
6 MR. ANWAR: Listen, you can object to
7 form. I'd ask you to limit the speaking objection.
8 I'd ask you to stop coaching the witness.
9 MR. THORNBURGH: I'm not. She's
10 already answered the question.
11 MR. ANWAR: If we have to take a
12 break and call the magistrate, we will. This is
13 unnecessary.
14 MR. THORNBURGH: You're correct. I
15 agree with you.
16 MR. ANWAR: We can call the
17 magistrate.
18 Q. I'm sorry, Mrs. Bagwell, do you have an
19 answer?
20 A. I gave you my answer.
21 MR. ANWAR: I'll move as
22 nonresponsive. We can move on from this topic.
23 I'll reserve our right to reopen the question, to
24 get an answer to that question.
25 MR. THORNBURGH: Sure. We oppose.

Page 75

1 Q. Let me change -- let's switch gears.
2 Can I ask you, you filed a lawsuit
3 against Boston Scientific. What led you to file a
4 lawsuit against Boston Scientific?
5 MR. THORNBURGH: Objection. Form.
6 Q. You can answer.
7 A. Can you repeat the question, please?
8 Q. Sure.
9 You have filed a lawsuit against
10 Boston Scientific. That's why we're here today.
11 Why did you file the lawsuit against Boston
12 Scientific or what led you to that decision?
13 A. In the summer of 2011 -- how do I say
14 this?
15 So I saw a commercial on TV, and
16 on this commercial they're -- they're saying all
17 these symptoms, everything that I was having. And
18 it just all came together at that time, and I called
19 my husband to -- I said, "Look at this commercial.
20 Look. They're talking about me."
21 And at that time we couldn't
22 rewind, so I didn't get the phone number. And then
23 I thought, well, I'll just see about other attorneys
24 in Colorado. So I called several, and they had no
25 idea what I was talking about. I left my name and

Page 76

1 number because they said they'd get back with me.
2 So my husband researched it more,
3 and he found my current attorneys that I have now.
4 And, like, within the next few days or so I had all
5 the other attorneys calling me back, saying we'll
6 take you as a client. But I was already with my
7 current attorney. And so that's how it came about.
8 Q. I understand. And you said that was in
9 the summer of 2011?
10 A. Correct.
11 Q. Do you know the name of the Boston
12 Scientific device that you received?
13 A. The Solyx.
14 Q. Did you know that at the time that you
15 were -- received that device?
16 A. Did I know what?
17 MR. THORNBURGH: Yeah. Objection to
18 form.
19 Q. Did you know the name of the device? Did
20 you know it was named the Solyx when you actually
21 received that device in November of 2009?
22 MR. THORNBURGH: Objection to form.
23 A. I don't recall, but I knew it was the
24 bladder sling because I received the brochure at the
25 office before the procedure.

Page 77

1 Q. And it was Dr. Cheryl Cowles who
2 performed the surgery to place the Solyx sling in
3 you; is that correct?
4 A. That is correct.
5 Q. And I have jotted down the date as being
6 November 18, 2009; is that right?
7 A. Correct.
8 Q. And what's your understanding as to why
9 you had the sling placed, the Solyx sling placed?
10 A. Because I was having some leakage. Like,
11 if I would cough or sneeze or get up too fast, I
12 would have some leakage.
13 Q. So issues with urinary incontinence; is
14 that fair?
15 A. Yes.
16 Q. What -- I understand that you're claiming
17 injuries in the lawsuit, correct, in this lawsuit?
18 A. Correct.
19 Q. What are the specific injuries that
20 you're claiming in the lawsuit?
21 MR. THORNBURGH: Objection.
22 Go ahead.
23 A. Well, I'm -- I'm -- I'm claiming to say
24 that I want my life back. That's what I'm claiming.
25 Q. I understand. In terms of --

Katrina Bagwell

Page 78

1    MR. THORNBURGH:  Hold on.
2    A.   I'm claiming that I don't want this pain
3 anymore.  I'm claiming that I want to go back to
4 work.  I'm claiming that I want to take care of
5 people.  I'm claiming that when I go to a restaurant
6 with my children, I want to be able to sit and have
7 a family gathering and not be there standing in a
8 corner in a restaurant.
9         And my kids see me in pain and my
10 husband sees me in pain, and it's not right.  They
11 should be seeing me coming home from work, and
12 having a great night at work.  They should be seeing
13 me going back to Walt Disney World, the place that
14 we loved going every year.  I can't do that anymore.
15 I'm claiming so much.
16    Q.   Do you need a minute?
17    A.   No.
18    Q.   Okay.  I guess what I'm --
19         MR. THORNBURGH:  No.  You asked the
20 question.  Let her finish, please.
21         MR. ANWAR:  She is no longer
22 speaking.  You don't need to --
23         MR. THORNBURGH:  Let the record
24 reflect that she's choked with tears.  That's why
25 she's paused.

Page 79

1         Please continue, if you have more.
2    A.   Yes.  I claim -- claim pain.  I'm
3 claiming suffering.  I am claiming the loss of my
4 job.  I am claiming the connection that I had with
5 my children, with my family, with my mom.  I am --
6    Q.   Okay.
7    A.   I am claiming the depression that I have,
8 the loss of intimacy with my husband that we used to
9 have.  It was always -- always so spontaneous and
10 loving, and now it's not that way anymore.
11         I am claiming I can't sit anymore.
12 I can't drive.  I cannot.
13         I don't want my Torture Tuesdays
14 anymore.  I want those Tuesdays to be filled with
15 family time.
16    Q.   And so I believe you've answered my
17 question, and I'd like to focus in now specifically,
18 and I want to actually walk through with you -- walk
19 through you -- walk through with you, excuse me --
20 we can take a break if you need a break.
21    A.   No.
22    Q.   But I'd like to walk through with you
23 specifically, like, the physical, the bodily
24 injuries that you're claiming in the lawsuit, to the
25 extent that you know what they are.

Page 80

1         So I know you mentioned pain that
2 you've experienced, pelvic floor pain.  Are there
3 other physical injuries that you're claiming in the
4 lawsuit?
5         MR. THORNBURGH:  Go ahead.
6    A.   So physical injuries?  Like, are you
7 talking about every day when I feel like my whole
8 pelvic floor is just rotting away?  When I feel grab
9 aches that take me to where I can't breathe?  Like,
10 last week I had a pain so bad I stopped breathing.
11 And then after that to see my husband in tears
12 because he doesn't know how to help me with my pain.
13         MR. THORNBURGH:  You asked the
14 question.
15         MR. ANWAR:  And she hasn't answered
16 the question, and I'm just going to ask some
17 follow-up questions to try to move this along.
18    Q.   And I understand, you have a lot to say.
19         So you mentioned pelvic pain.  Are
20 you having currently or are you claiming issues in
21 the lawsuit related to urinary incontinence, any
22 incontinence issues?
23         MR. THORNBURGH:  Objection.
24    A.   Yes, I have those.
25    Q.   Okay.  So as of today, are you still

Page 81

1 having issues with urine leaking from your
2 bladder -- or from your vagina?
3    A.   Yeah.  If I have a really bad cold and I
4 cough, if I cough a lot, then I have leakage.  And,
5 like, I don't -- I can't release my urine, all of it
6 all the way.  Like, I have to go a little bit and
7 then go.
8    Q.   Are you claiming in the lawsuit -- and I
9 will tell you some of these items, these are things
10 that you've listed in your Fact Sheet.
11         Are you claiming issues with
12 infection as an injury in the lawsuit?
13    A.   That is correct.  I've had seven urinary
14 tract infections within one year.
15    Q.   Are you --
16    A.   And I'm taking those meds, you know, all
17 the antibiotics that I take.
18    Q.   I understand.
19    A.   There's just so many, so many that I've
20 taken.
21    Q.   Are you claiming sex during -- excuse
22 me -- pain during intercourse as an injury in the
23 lawsuit?
24    A.   Yes.  I talked about that, loss of
25 intimacy with my husband.

Katrina Bagwell

Page 82

1    Q.   I believe you had stated you're unable to
2 sit for long periods of time, correct?
3    A.   Correct.
4    Q.   Is that an injury that you're claiming in
5 the lawsuit?
6    A.   Correct.
7       MR. THORNBURGH:  I just want to
8 correct the record.  She's not able to sit.  It's
9 not for long periods of time.  She's not able to
10 sit, period.
11    Q.   Is it your testimony that you're not able
12 to sit, period, at all?
13    A.   Like, sitting upright in, like, a regular
14 chair like you guys are, no.  That -- but if it's,
15 like, this kind, like, where it goes back, yes
16 (indicating).
17       MR. THORNBURGH:  Let the record
18 reflect that she's pointing to a zero-gravity chair.
19       MR. ANWAR:  Okay.
20    A.   Or when I'm in a car seat, the car seat
21 has to be leaned back.  So, you know, for me, like,
22 when I went to get my driver's license, that was an
23 issue.  Because I let the DMV know, how safe is it
24 for me as a passenger when I sit far back?  And it's
25 not safe.  If we got into a wreck, it's horrible.

Page 83

1       Thinking that when I lean back,
2 I'm -- I'm looking up at the car, the fabric in the
3 car.  It's not like taking a scenic view.
4       Getting in a car -- like, my mom
5 lives in Longmont.  It's an hour and a half away
6 from my home.  So sitting in a car is --
7    Q.   And to be -- so I want to make sure I
8 understand correctly.
9       Your testimony is is that you're
10 unable to sit in a chair, like an upright chair,
11 correct?
12    A.   Correct.
13    Q.   You are able to sit at least to some
14 capacity in a chair that's reclining; is that
15 correct?
16    A.   Yeah.  As long as I'm not in pain.
17 Like -- but when I have pain that is so bad, I have
18 to, like, lie completely flat.  I don't want nobody
19 to touch me.  I can hardly breathe.  And it's just
20 laying flat.
21       And I lay flat so much sometimes
22 that I feel like the back of my head is going bald.
23 You know, like a baby, a newborn baby when they lay
24 and you can see how they lay.  That's how I feel
25 because I lay a lot.  It's either standing or the

Page 84

1 chair or laying flat.
2    Q.   With respect to your physical -- the
3 physical injuries that we've discussed that you're
4 claiming in the lawsuit, is there anything that you
5 can do to relieve those symptoms or the pain?
6    A.   Well, like I had stated before, inside
7 this box is all the tools I have to use to get
8 through my day.  Everything.
9       The biggest tool that I have is my
10 husband.  Because when I get in pain so bad, he has
11 to come behind me and -- and really, really pull my
12 leg and stretch it because the pain is so bad and my
13 muscles are so tight.  So having Luke is -- is --
14 you know, my physical therapist tried to --
15    Q.   And --
16    A.   -- teach him --
17       MR. THORNBURGH:  Let her answer the
18 question.
19    A.   So when my physical therapist does
20 internal massages, it is a relief.  It helps.
21       So, you know, Dr. Flynn advised
22 Dr. Gerig and Carrie, because they know how far away
23 I live from physical therapy, they said maybe Luke,
24 if you can get Luke to learn how to massage inside.
25       But, you know, he's my husband.

Page 85

1 It's like crossing a line of him having to go inside
2 me and massage, you know, like, a -- like physical
3 therapy.
4    Q.   And just to -- and sort of to make sure
5 I'm understanding you correctly.  Does physical
6 therapy, the physical therapy that you engage in,
7 does that help relieve the pain that you experience?
8    A.   Yes.
9    Q.   Are you claiming psychological sort of
10 mental health or emotional damages in the lawsuit?
11    A.   Yes.
12    Q.   Okay.
13    A.   I can tell you all about that.
14    Q.   Are you claiming that you're suffering
15 from depression as a result of the injuries in the
16 lawsuit?
17    A.   Yes.
18    Q.   Have you seen -- are you seeing any,
19 like, mental health provider or, like, psychologist,
20 therapist --
21    A.   Yes.
22    Q.   -- related to the issues --
23    A.   Yes.
24    Q.   -- that you're claiming in the lawsuit?
25    A.   Yes.

Katrina Bagwell

Page 86

1  Q.  Who is that person?
2  A.  Christine Bibeau.
3  Q.  How long have you been seeing her?
4  A.  Since 2014.  And I used to go to her
5  twice a week, then once a week, and now I go every
6  other week, and this has been since 2014.
7  Q.  Have you seen -- are you seeing any other
8  mental health providers or psychologists,
9  psychiatrists, anything like that, other than
10  Christine Bibeau?
11  A.  No.
12  Q.  And you said you've been seeing
13  Ms. Bibeau since 2014?
14  A.  Correct.
15  Q.  What about prior to 2014, have you seen
16  any mental health professional, psychiatrist,
17  psychologist?
18      MR. THORNBURGH:  Objection.
19  A.  Well, when I was going through my
20  divorce, that was just a little upsetting, so I did
21  go talk to somebody for a couple weeks.  That was
22  it.
23  Q.  Other than for your divorce, at any point
24  have you seen --
25  A.  No.

Page 87

1  Q.  And just so it's clear on the record.
2      So other than your divorce, it's
3  your testimony you have not seen any other sort of
4  mental health provider, psychiatrist, psychologist?
5  A.  Correct.
6  Q.  Just Christine Bibeau related to the
7  issues you're claiming in the lawsuit?
8  A.  Correct.
9  Q.  Have you ever filed any lawsuits prior to
10  this one?
11  A.  No.  Before this lawsuit, no.
12  Q.  This is the only lawsuit you've ever
13  filed?
14  A.  Yes.  And then my divorce, I guess that.
15  Q.  Not counting your divorce, have you been
16  involved in any other civil lawsuits?
17  A.  No.
18  Q.  Is that a no?
19  A.  Correct.
20  Q.  So I want to talk a little bit just
21  quickly about your general medical history.
22      So you received the Solyx sling,
23  that's at issue in this lawsuit, in November of
24  2009, correct?
25  A.  Correct.

Page 88

1  Q.  And that was placed because you were
2  having issues with urinary incontinence, fair?
3  A.  Correct.
4  Q.  Setting those issues aside, were there
5  any other issues you were having at your -- with
6  your health prior to placement of the Solyx sling?
7  A.  I had an ablation, where they burn the
8  lining of your uterus, because I was bleeding a lot,
9  like, way more than anyone should.  And I got
10  anemia, and I had to have a blood transfusion, and
11  so that's why they decided on an ablation.
12  Q.  Did Dr. Cowles perform the ablation?
13  A.  Yes.
14  Q.  Did she tell you why you were -- your
15  uterus was bleeding?
16  A.  No.  She just said that sometimes that
17  happens more than others.
18  Q.  Do you have any understanding about why
19  your uterus was bleeding?
20  A.  Well, it happened to my mom.  It happened
21  to my sister.  Both of them almost died because of
22  it.  And then when it happened to me, they wanted to
23  do a hysterectomy.  And then they also gave an
24  option of the ablation so that I would keep my --
25  keep the hormones, the ovaries.  And so I -- I went

Page 89

1  with the ablation.
2  Q.  So with the ablation, just the lining of
3  your uterus was removed as opposed the entire uterus
4  with a hysterectomy?
5  A.  Correct.  They burn it.
6  Q.  And you mentioned that your mom passed?
7  A.  No, she almost.
8  Q.  She almost passed?
9  A.  She almost died from hemorrhaging.
10  Q.  Your mom almost died due to hemorrhaging
11  because of bleeding from her uterus?
12  A.  Uh-huh.  My sister too.
13  Q.  Was it one sister or more than one
14  sister?
15  A.  Just one.
16  Q.  Did she die?
17  A.  No.
18  Q.  Okay.  But she --
19  A.  But she --
20  Q.  Go ahead, I'm sorry.
21  A.  But she should have something done
22  because her anemia is really bad because of her
23  bleeding every month.
24  Q.  During the course of speaking with your
25  mom and your sister and your health care providers,

Katrina Bagwell

Page 90

1  do you have any understanding whether that -- like,
2  whether the -- what the name of that condition is or
3  what that condition is?
4         MR. THORNBURGH:  Objection.
5     A.   No.  Bleeding, bad periods.
6     Q.   Okay.  I understand.  So other -- so
7  we've talked about the bleeding from your uterus.
8  Were you having any other issues with your health?
9     A.   No.
10    Q.   What about the surgeries.  Prior to the
11  surgeries that you had related to placement of the
12  mesh and removal of the mesh, did you ever have any
13  other surgeries performed on you, with the exception
14  of the -- let me start over.
15         We talked about earlier that you
16  had five C-sections, correct?
17    A.   Correct.
18    Q.   So I don't want to -- I'm not talking
19  about those.  And I understand that you've had --
20  you had surgery both to place the mesh, the Solyx
21  sling, and then as well as surgeries to remove
22  portions of the Solyx sling; is that correct?
23    A.   Yes.
24    Q.   And I'm also not talking about those.
25         So setting those surgeries aside,

Page 91

1  have you ever had any other surgeries in your life?
2     A.   I've had five cesareans, my mouth
3  surgery, and then they took a cyst out right here
4  (indicating).  That's all.
5     Q.   Okay.
6         MR. THORNBURGH:  And the let the
7  record reflect the cyst was located on her wrist,
8  because that's where she pointed to.
9         THE WITNESS:  Yeah.
10         MR. THORNBURGH:  Sorry.
11    Q.   Have you ever taken or been prescribed
12  hormones?
13    A.   Hormones, no.  Well, I don't know.  This
14  cream that the doctor gave me that I haven't started
15  yet is, like, this estrogen cream that I put around
16  my vagina, that she said would help there.  But I
17  haven't started it.
18    Q.   When were you prescribed that cream?
19    A.   At my last visit.
20    Q.   So in 2019?
21    A.   Yes.
22    Q.   Who prescribed that to you?
23    A.   Dr. Gerig.
24    Q.   Prior to the cream that Dr. Gerig
25  described -- or prescribed that you just mentioned,

Page 92

1  have you ever received any other hormone replacement
2  sort of therapies or creams?
3     A.   No.
4     Q.   Do you have any history of keloids or
5  scar tissue formation that you're aware of?
6         MR. THORNBURGH:  Objection.
7     A.   What's a keloid?
8     Q.   And if you don't know, it's totally fine
9  to say I don't know.
10    A.   I don't know with the keloid.
11    Q.   Have you had any issues with scar tissue
12  forming in your body?
13    A.   Well, when I had the ablation and then
14  the sling put in, the doctor also did -- she removed
15  whatever she thought was -- shouldn't be there.
16    Q.   I understand.  And we'll get specifically
17  to Dr. Cowles' surgery here shortly.  I guess I'm
18  just focusing in the period of time before you had
19  that surgery.
20    A.   Oh, no.
21    Q.   So --
22    A.   So, no, I didn't have anything.
23    Q.   Okay.  Did you ever have any issues
24  with -- and again, prior to the time, prior to the
25  placement of the sling in November of 2009, did you

Page 93

1  have any issues with, like, depression, anxiety,
2  anything like that?
3     A.   No.  You know, I continued working.  I
4  stayed working, you know.  Just the little bout that
5  I had when I got the divorce.
6     Q.   I understand.  Have you ever had any
7  issues with substance abuse, anything like that?
8     A.   No.
9     Q.   Any other sort of psychiatric disorders
10  in the past?
11    A.   No.
12    Q.   Has any health care provider specifically
13  diagnosed you with, like, a mental health issue that
14  you're aware of?
15    A.   No.
16         Would I -- would I -- should I say
17  my psychologist now?  Because she says I do have
18  depression.  Is that --
19    Q.   You can say that.
20    A.   Like, now.
21    Q.   So Dr. Bibeau has diagnosed you with
22  depression?
23    A.   Christine Bibeau, yes.
24    Q.   When did she diagnose you with
25  depression?

Katrina Bagwell

Page 94

1    A.   I think when I first started seeing her
2  because we always talked about depression.  We
3  always talked about the pain I go through in the day
4  and what I have to do to get through it, and how
5  angry I am that this is happening to me.
6    Q.   So that, I believe you stated you started
7  seeing her in roughly 2014?
8    A.   Correct.
9    Q.   Okay.  Other than Dr. Bibeau diagnosing
10  you with depression, no other instances of a doctor
11  diagnosing you with a mental health issue?
12    A.   Correct.
13    Q.   Have you ever smoked?
14    A.   No.
15    Q.   I know you mentioned your mother and your
16  sister have issues with bleeding from your uterus?
17        MR. THORNBURGH:  Objection.  Form.
18    Q.   And do you recall that discussion?
19        MR. THORNBURGH:  You said your mother
20  and sister bleeding from your uterus.  That's
21  totally --
22        MR. ANWAR:  Okay.
23        MR. THORNBURGH:  -- unintelligible.
24        MR. ANWAR:  I understand.  Well, let
25  me re-ask the question.  I appreciate the

Page 95

1  clarification.
2    Q.   I recall -- you remember we had a
3  discussion earlier.  I believe you testified that
4  your mother and your sister had issues with bleeding
5  from their uteruses, correct?
6    A.   Correct.
7    Q.   Okay.  I've seen a note in your medical
8  records to the -- like, sort of the issue with your
9  uterus, the bleeding from your uterus being referred
10  to as menorrhagia.  Does that sound right to you?
11  Have you heard of that?
12    A.   Yes.
13        MR. THORNBURGH:  Menorrhagia.
14        MR. ANWAR:  What?  Excuse me?
15        MR. THORNBURGH:  Menorrhagia.
16        MR. ANWAR:  Okay.  Thank you.
17    Q.   Is that your understanding, is that the
18  same thing we're talking about, the bleeding from
19  your uterus?
20    A.   Yes.
21    Q.   Has your mother or your sister ever gone
22  through any pelvic repair surgeries or pelvic
23  surgeries that you're aware of?
24    A.   No.  Well, my mom.  She had the
25  hysterectomy.  That's all.

Page 96

1    Q.   Anything else that you're aware of?
2    A.   No, nothing.
3    Q.   The menorrhagia, you would agree that
4  existed before you received the Solyx sling,
5  correct?
6    A.   Correct.
7    Q.   And so fair to say you're not claiming
8  the bleeding from your uterus, the menorrhagia, as
9  an injury in the lawsuit, correct?
10    A.   Correct.  That was all cured.  I was --
11  the doctor even stated that they cured my condition.
12    Q.   I understand.  I want to focus in on the
13  period leading up to your November 2009 implant
14  surgery.
15        And so I'd like to ask you, what
16  symptoms, issues were you having at that time that
17  led you to undergo the mesh surgery?
18        MR. THORNBURGH:  Objection.
19    A.   So do you mean right after the surgery?
20    Q.   I'm focusing specifically on the period
21  of time before November of 2009.  So before you had
22  the Solyx sling placed, but leading up to having the
23  sling placed, what -- what issues or problems were
24  you having that ultimately led to your decision to
25  have the mesh surgery?

Page 97

1        MR. THORNBURGH:  Objection.
2    A.   Well, I was leaking.  And when I would
3  cough or sneeze or get up too fast, I would have
4  leakage.  And sometimes I would have to use a mini
5  pad, and it was really embarrassing because of,
6  like, if I would have urine odor from the leakage or
7  because if it happened out in public, that kind of
8  thing.
9    Q.   I understand.  How often were you leaking
10  urine leading up to the mesh surgery in November
11  2009?
12    A.   It was enough for me to bring it up to
13  Dr. Cowles.  I would say I don't know.
14    Q.   You mentioned coughing -- urine would
15  leak when you coughed and you sneezed, correct?
16    A.   Correct.  Or if I would get up too fast
17  or...
18    Q.   Were there any other times that urine
19  would leak at that time?
20    A.   Well, I remember it being at work
21  because, you know, we wore scrubs.  So, like, when I
22  would have the leakage, I would always have to go
23  ask the head nurse if I could have a new set of
24  scrubs because of what was happening.
25    Q.   So this was the period of time before

Katrina Bagwell

1  2009 when you had the mesh surgery?
2      A.   Correct.
3      Q.   Have you ever had any instances of
4  accidents at work with urine leakage?
5      A.   Huh?
6      Q.   You mentioned -- I'm sorry.  I can ask a
7  better question.
8              You mentioned that you had to ask
9  at least on one occasion the head nurse for a new
10 pair of scrubs because you experienced urine
11 leakage, correct?
12     A.   Correct.
13     Q.   Were there any other times where you had
14 sort of urine leakage, where you had to ask for
15 scrubs or it was sort of in a public way?
16     A.   So, like, at work and if we would go on
17 an outing, I would always make sure I had a clean
18 pair of underwear and pants.  So, you know, that was
19 some of the leakage that was happening.
20     Q.   You mentioned that you would wear pads;
21 is that correct?
22     A.   Just like a little mini pad.
23     Q.   How many pads would you use in a day?
24     A.   Maybe one or two.  It would just depend
25 really, like, if I can get to the bathroom or if I

1  could really hold it.
2              THE WITNESS:  But is it okay if we
3  take a break because I'm in a lot of pain right now.
4              MR. THORNBURGH:  Yeah.
5              MR. ANWAR:  Sure.  Let's take a
6  break.
7              MR. THORNBURGH:  Yeah.
8              (Break from 12:26 p.m. to
9                   1:01 p.m.)
10 BY MR. ANWAR:
11     Q.   We are back on the record from a break.
12 Mrs. Bagwell, are you okay to continue?
13     A.   Yes, I am.
14     Q.   If at any point you need to take a break,
15 just let me know.  We're happy to accommodate you.
16             MR. ANWAR:  I will just note for the
17 record that Mrs. Bagwell, she was previously
18 standing, and now she's sitting on -- I don't know
19 the name for it.
20             MR. THORNBURGH:  She's reclined on a
21 zero-gravity recliner.
22             MR. ANWAR:  Okay.  She's reclined on
23 a zero-gravity reclining chair.
24     Q.   Mrs. Bagwell, when we left off we were
25 talking about the issues you were experiencing with

1  incontinence leading up to your November 2009
2  surgery to have the Solyx sling placed.  Do you
3  recall that?
4      A.   Yes.
5      Q.   I think I had just asked you a question
6  about how many pads you typically had to use in a
7  day when you were in the period leading up to the
8  surgery.  Do you recall that?
9      A.   Yes.
10     Q.   So I don't know if I got your full
11 response, so I'm just going to ask you again.
12             I know you were experiencing
13 issues with incontinence.  How many pads did you
14 have to use at that time leading up to the surgery?
15     A.   So it was mini pads, little thin mini
16 pads, and maybe one or two a day.  But if we're
17 talking about menstrual pads, I was bleeding a lot
18 and I was using lots of those pads for the bleeding.
19     Q.   Okay.  And the bleeding was related to
20 the menorrhagia that we were discussing earlier,
21 correct?
22     A.   Correct.
23     Q.   Okay.  Do you remember how -- how -- let
24 me ask it differently.
25             Do you remember when before --

1  when you started experiencing issues with urinary
2  incontinence?
3      A.   It was just a little bit prior to seeing
4  Dr. Cowles.
5      Q.   Okay.  When you say a little bit prior,
6  if you had to -- if you can give a best estimate,
7  would it be more than six months?  Less than six
8  months?
9      A.   I would say less.
10     Q.   Okay.
11     A.   Less, yeah.
12     Q.   So within the six months leading up to
13 the surgery with Dr. Cowles is when you started
14 experiencing urinary incontinence?
15     A.   Yes.
16     Q.   Okay.  Was it getting worse over time, as
17 time was going on?
18     A.   No.  You know, it just depends, like,
19 what I was doing at the time, like, if I was at
20 work, at home.
21     Q.   Okay.  So it was -- leading up to your
22 surgery with Dr. Cowles to have the sling placed, it
23 was about constant, just depending on what you were
24 doing at home.  Is that a fair characterization?
25     A.   It was just like when I coughed, sneezed,

Katrina Bagwell

Page 102

1  get up to fast, that kind of thing.
2      Q.   Okay.  I wanted to circle back to -- and
3  I'm probably going to continue to mispronounce this,
4  so I apologize if I do, but the menorrhagia.
5           I noticed that in one of
6  Dr. Cowles' notes, actually the history and physical
7  that she performed before she actually placed the
8  surgery -- or placed the sling in you, she states,
9  "The patient had been seen in emergency rooms over
10  the years for severe menorrhagia and at one point
11  had a blood transfusion and often has to call into
12  work because of heavy menstrual flow?"
13           Is that -- does that sound right
14  to you?  Is that accurate?
15      A.   Correct.
16      Q.   Okay.  Prior to your -- I know we were
17  talking about your symptoms prior to having the
18  sling placed.  Did you -- do you recall experiencing
19  any pelvic pain prior to your sling being placed?
20      A.   No.
21          MR. THORNBURGH:  Objection.
22      A.   Just I had bad bleeding.  And when you
23  have bad bleeding, you have menstrual cramps.  So it
24  was the menstrual cramps with the bleeding.
25      Q.   Okay.  I will just represent to you that

Page 103

1  in the same note that I was looking at, it's a
2  history and physical before Dr. Cowles placed the
3  sling in you, it states that, "The patient is also
4  complaining of severe dysmenorrhea, but bilateral
5  lower pelvic pain that has been constant now for the
6  last three to six months.  She is also having pain
7  with intercourse.  She states that it feels so bad
8  that it feels like the ovaries are going to pop
9  out."
10          Do you recall that?
11      A.   That was all a part of the menstrual
12  cramps and what was happening to my body with the
13  bleeding.
14      Q.   So your understanding of the pain you
15  were experiencing before placement of your sling is
16  that it was related to the bleeding that you were
17  experiencing with the menorrhagia?
18      A.   Correct.
19          MR. THORNBURGH:  That's a hard one.
20          MR. ANWAR:  Yeah.  You pronounced it
21  way better than I did.
22      Q.   I'm sorry.  That was a yes?
23      A.   Yes.
24      Q.   Okay.  I guess regardless of whether it
25  was related to the menorrhagia or not, would it be a

Page 104

1  fair characterization that you were experiencing
2  some pelvic pain and pain during sex in the three to
3  six months before you received the sling?
4          MR. THORNBURGH:  Objection to the
5  caveat.
6          MR. ANWAR:  What's that?
7          MR. THORNBURGH:  Objection to the
8  caveat, because you can't separate the two.  You
9  can't say regardless of whether or not it was or
10  wasn't.
11          MR. ANWAR:  Let me -- let me re-ask
12  the question.
13      Q.   Is it fair to say that you were
14  experiencing pelvic pain and pain during intercourse
15  in the three to six months leading up to placement
16  of your sling?
17          MR. THORNBURGH:  Objection.
18      Q.   You can answer.
19      A.   How do I answer this?  So during that
20  time I bled a lot.  I bled, like, I would say 20
21  days out of the month, okay?  And Luke and I would
22  always want to be intimate.
23          So during the cycle of bleeding we
24  would try to have sex, and that's when the pain
25  would come in, because I was on my period and trying

Page 105

1  to have sex and the bleeding.  It wasn't pleasant,
2  but we tried to do what we could to be intimate.
3          But I want you to know that in the
4  records, once she did the ablation, it stated in
5  there everything, everything just was fine.  Since
6  I've -- you know, it's hard to have sex when you
7  have your cycle.
8      Q.   And --
9      A.   And you bleed so much.
10      Q.   I understand.  I guess all I'm asking is
11  you would agree, though, that you were experiencing
12  at least some pelvic pain in the three to six months
13  leading up to placement of the sling?  And I'm just
14  sort of looking for agree?  Disagree?
15          MR. THORNBURGH:  Objection.  She
16  answered it the best she can.  Just because you
17  don't like the answer --
18          MR. ANWAR:  You can object.
19          MR. THORNBURGH:  -- doesn't mean you
20  get to keep on asking.
21          MR. ANWAR:  I'm not -- I'm just
22  looking for the --
23          MR. THORNBURGH:  She's answered the
24  question.
25          MR. ANWAR:  I'm going to please ask

Katrina Bagwell

Page 106

1 you to stop speaking on the record. You can object
2 to form.
3        MR. THORNBURGH: No.
4        MR. ANWAR: It's not an appropriate
5 objection. And so I'm going to ask the question
6 again.
7    Q.   Mrs. Bagwell --
8        MR. THORNBURGH: For the fourth time.
9    Q.   -- you would agree that in the three to
10 six months leading up to placement of your sling,
11 you were experiencing at least some pelvic pain,
12 correct?
13        MR. THORNBURGH: Objection.
14    A.   When I was --
15    Q.   I think you --
16    A.   -- on my cycle, we would try to have
17 intercourse. But because of me bleeding so bad and
18 the cramps that I was having, intercourse wasn't
19 pleasant, but we would try. And it was because, the
20 pain was because of my bleeding, my cramping.
21    Q.   Okay. So I want to focus in now on the
22 mesh surgery itself, the surgery with Dr. Cowles.
23 And just so we're absolutely clear on the record, I
24 know we've established this already, but you --
25 that's the surgery -- that surgery took place on

Page 107

1 November 18, 2009; is that correct?
2    A.   Correct.
3    Q.   Okay. And it was Dr. Cheryl Cowles that
4 placed the Solyx sling in you during that surgery,
5 correct?
6    A.   Correct.
7    Q.   Who referred you to Dr. Cowels or why did
8 you go to see her?
9    A.   Well, again my community, in my hospital
10 community, I worked at Lutheran Medical Center. And
11 so I asked around, you know, who -- who would they
12 refer. And so she was referred by many people at
13 the hospital, and so that's why I went to her.
14    Q.   Okay. Do you remember, approximately,
15 when you went to first go see Dr. Cowles?
16    A.   In 2008, at the end of 2008.
17    Q.   At the end of 2008?
18    A.   Uh-huh.
19    Q.   And why did you go to see Dr. Cowles at
20 that time?
21        MR. THORNBURGH: Objection.
22    A.   Because I was -- I was bleeding a lot. I
23 had really bad menstrual cycles.
24    Q.   So when you went to see her at the end of
25 2008, it was related to the issues you were

Page 108

1 experiencing bleeding, correct?
2    A.   Correct.
3    Q.   At that time were you having any issues
4 with incontinence?
5    A.   Yes.
6    Q.   So when you first saw her, you went to
7 see her for treatment related to both the issues
8 with bleeding and the incontinence?
9    A.   I went to see Dr. Cowles for the issues
10 of -- the problems with my bleeding. And while I
11 was at my appointment she said, "Do you have any
12 other problems or concerns?" So I brought up that I
13 leak, you know, when I stand or get up too fast.
14 And so she said that she would be able to help me in
15 the incontinence. And so while she does the
16 ablation, she can go ahead and help with the
17 incontinence issues as well.
18    Q.   So what course of the treatment did
19 Dr. Cowles recommend to you?
20    A.   So we did lots of tests in the bladder.
21 She did different tests to make sure that I was a
22 good candidate for the bladder sling. And so when
23 those tests were complete, she recommended the
24 sling. And, you know, that's when I was given the
25 brochure, and then I was also given a brochure on

Page 109

1 the ablation. And she said, "Take it home to your
2 husband, and you guys discuss these options." And
3 so we did, and I went ahead with the surgery.
4    Q.   I think you mentioned, or I thought I
5 understood your testimony to be, that you first saw
6 Dr. Cowles at the end of 2008; is that correct?
7    A.   Yeah. That was my very first
8 appointment, I think.
9    Q.   And then you ultimately had the surgery
10 and the placement of the sling in November of 2009?
11    A.   Correct.
12    Q.   So during that sort of 11-month whatever
13 or year period of time, end of 2008 to beginning of
14 2009, did you continue to see Dr. Cowles?
15    A.   Yes, I did. And we talked about, you
16 know, the bleeding.
17        And if you'll notice in the
18 documents there, it is stated that when I went -- I
19 did schedule surgery for earlier, but my mom became
20 really ill so I couldn't go through the surgery and
21 I had to reschedule. But I continued to see her
22 because, you know, we would have regular checkups.
23    Q.   How many times do you think you saw her
24 between the first time you saw her at the end of
25 2008 and then when you actually had surgery with her

Katrina Bagwell

Page 110

1 in November of 2009?
2     A.   How many times?  I don't know.  Maybe --
3 I would say maybe three or four maybe.  I don't
4 recall exactly how many.
5     Q.   Did you have any discussion with
6 Dr. Cowles about sort of the risks versus the
7 benefits of treating your urinary incontinence?
8     A.   Yeah.  Well, you know, we talked about,
9 like, after surgery how I will experience pain, and
10 that how she talked about how she's going to treat
11 that pain.  And so, yeah, we talked about the
12 surgical risks because I had different things done
13 inside me.
14     Q.   Was there any discussion about sort of
15 what the progression of your incontinence would be
16 if you left it untreated or didn't have surgery?
17     A.   You know, well -- well, I remember that I
18 had -- I had talked about, well, if I don't get this
19 done will I be like my mom, you know, to have to
20 wear a diaper for incontinence.
21          But, you know, she just reassured
22 me very much about the sling, and I felt -- I felt
23 so confident and reading the brochure and just that
24 this was going to fix what was wrong.  This is going
25 to be a good thing.

Page 111

1     Q.   You mentioned whether you were going to
2 have to wear a diaper like your mom.  Did your mom
3 have to ultimately end up wearing, like, a permanent
4 pad or a diaper?
5          MR. THORNBURGH:  Objection.
6     A.   She just wears, like, a mini pad.  Now
7 that my mom's older, she's in her 70's, now she
8 wears the diapers.
9     Q.   Do you know what for?
10     A.   Well, like, if my mom laughs too loud,
11 she leaks a little bit.
12     Q.   Leaks urine?
13     Q.   Sorry?
14     Q.   Leaks urine?
15     A.   Yeah.  I mean, she's -- it's just old age
16 for her.
17     Q.   When you were talking with Dr. Cowles in
18 the period leading up to your mesh surgery, did she
19 ever tell you that if you left the incontinence
20 untreated, that it would be worse?
21     A.   I cannot recall that, no.
22     Q.   Did Dr. Cowles present you with any
23 treatment options other than surgery and having the
24 mesh placed?
25     A.   No.  It was the confidence that she had

Page 112

1 in the bladder sling that -- that was the treatment,
2 and we both felt really good about it.
3     Q.   So surgery and placement of the sling was
4 the only treatment option you discussed with
5 Dr. Cowles?
6     A.   Well, you know, continuing to wear mini
7 pads and just continuing as I am with the leakage of
8 when I sit or stand or cough, get up too fast.
9     Q.   Are you saying continuing with the mini
10 pads if you didn't have the surgery?
11     A.   Correct.
12     Q.   Did you ultimately rely on Dr. Cowles to
13 choose the best treatment option for you?
14          MR. THORNBURGH:  Objection.
15     A.   Yes, because I felt very confident in her
16 because she was recommended by many doctors,
17 surgeons that I worked with in the hospital, nurses
18 that I worked with in the hospital, administrative
19 staff that I worked with in the hospital.  So I felt
20 very confident in her care plan for me, that she
21 proposed to me.
22     Q.   Do you personally have any criticism of
23 the portion of the treatment that you received from
24 Dr. Cowles?
25     A.   No.  She -- she did everything, you know.

Page 113

1 Like, for my pain, she was helping with it.  And
2 physical therapy with getting me back to work, she
3 was there, along with her partners as well.
4     Q.   Do you continue to see Dr. Cowles today?
5     A.   She's in Kenya.
6     Q.   When did you stop seeing Dr. Cowles?
7     A.   I stopped seeing her -- I think it was in
8 2010, is when I stopped.
9     Q.   Was there any reason you stopped seeing
10 her in 2011?
11     A.   Well, I didn't want to stop seeing her,
12 but I was forced to because my insurance at Lutheran
13 Medical Center, they said that if you make below
14 this certain amount of money, you have to switch to
15 Kaiser.  So they made me switch my insurance, so
16 that's why I had to go to Kaiser.
17     Q.   Okay.  I understand.  Now, you mentioned
18 that Dr. Cowles provided you with this Boston
19 Scientific brochure; is that correct?
20     A.   Correct.
21     Q.   And we've marked this as Exhibit 2, and
22 I'll pass it your way if you'd like to look at it.
23 And this is the exact same brochure that Dr. Cowles
24 provided to you?
25     A.   Correct.

Katrina Bagwell

Page 114

1    MR. THORNBURGH:  Just for the record,
2 when you say "exact same brochure," there's some
3 ambiguity.  It's a copy of the exact same brochure.
4    A.   Yeah.  It wasn't like this on a paper.
5 It was an actual brochure.
6    Q.   And so that's what I was getting at
7 earlier.  It looks like, to me, there are some
8 legal, like, sort of numbers at the bottom and that
9 it's been produced as part of these lawsuits.
10        This is not the original copy of
11 the brochure that Dr. Cowles gave to you; is that
12 fair?
13        MR. THORNBURGH:  Objection.  Vague
14 and ambiguous with respect to --
15    Q.   Like, that's not literally -- Exhibit 2
16 that you're holding, that's not literally the
17 brochure, the exact same piece of paper, brochure
18 that Dr. Cowles gave to you, correct?
19        MR. THORNBURGH:  Objection.  It's a
20 copy.
21    A.   Yeah.
22    Q.   Would you agree, there's a difference
23 between -- I'm not saying that the content is
24 different.  What I'm saying is that's physically not
25 literally the same exact piece of paper that

Page 115

1 Dr. Cowles gave to you.  It may be a copy, but would
2 you agree it's not literally the same thing that she
3 gave to you?
4    A.   I received a brochure (indicating).
5    Q.   That looked like the one you're holding
6 today?
7    A.   It is this brochure, right here.  This is
8 what I received.  This is the exact same brochure
9 that I received.
10    Q.   Okay.
11    A.   Just not on this piece of copy paper.
12    Q.   Okay.
13    A.   It was a brochure.
14    Q.   I understand.  I think we're saying the
15 same thing, and we're just kind of -- I just want it
16 to be clear on the record.
17        That's a copy of the exact same
18 brochure that you received, correct?
19    A.   Correct.
20    Q.   That's all I wanted to get at.
21        Can you sort of describe to me
22 what that brochure is or what your understanding of
23 that brochure is?
24    A.   My understanding of this when I received
25 it was very good.  It was going to fix what was

Page 116

1 going on --
2    Q.   Okay.
3    A.   -- with my leakage.  And Dr. Cowles felt
4 very confident about this.  When I read it, I felt
5 very confident about this.  My husband read it, he
6 felt very confident about this.  That's why I went
7 through with the procedure.
8    Q.   Would you -- would you agree that that
9 particular brochure doesn't contain any specific
10 information about the Solyx sling itself?
11        MR. THORNBURGH:  Objection.
12 Mischaracterization.
13    Q.   Does -- I mean, you're holding the
14 brochure.  Does that brochure contain any, like,
15 specific information about the Solyx sling?
16    A.   It talks about the sling.  It talks about
17 everything that I can expect.
18    Q.   So I'll just tell you that I had an
19 opportunity to flip through the brochure, and to me
20 it looks like it's a brochure that talks generally
21 about --
22    A.   The bladder.
23    Q.   -- incontinence and treatment options
24 with incontinence.  Would you agree with that?
25        MR. THORNBURGH:  Objection.

Page 117

1 Mischaracterization.
2    A.   Well --
3        MR. THORNBURGH:  It's got a picture
4 of the Solyx.
5    A.   Well, this brochure talks about how it
6 will help with my condition.  And when I read it, I
7 felt confident.
8    Q.   And I guess the only thing I'm trying to
9 get at -- and if you can find it for me, if you can
10 direct me to it -- is there any discussion in that
11 brochure specifically about the Solyx sling?
12        MR. THORNBURGH:  Objection.
13    Q.   And you can take a moment to look at it.
14 And if you can find it, you know, I'd just ask that
15 you can point me to it.
16        MR. THORNBURGH:  Would you like her
17 to circle --
18        MR. ANWAR:  Sure.
19        MR. THORNBURGH:  -- or highlight?  Or
20 what would you like --
21        MR. ANWAR:  Yeah.  Sure.
22        MR. THORNBURGH:  -- her to do?
23    A.   So what do you want me to look for?
24    Q.   I'm just looking -- I'm just asking you,
25 does it say -- is the Solyx sling mentioned in that

Katrina Bagwell

Page 118

1 brochure?
2    A.   There's a whole brochure that talks about
3 what the sling can provide to me.
4    Q.   Does it talk about the Solyx sling, or
5 does it talk about slings in general?
6        MR. THORNBURGH:  Objection.
7    A.   Well, it talks about urinary incontinence
8 and what this type of product can do for you.
9    Q.   I mean, I'm just going to ask you
10 directly.  I don't -- I've reviewed it.  I didn't
11 see anywhere in the brochure the Solyx sling is
12 discussed specifically or mentioned by name.  I'm
13 just asking you if you disagree or if you disagree
14 with that?
15        MR. THORNBURGH:  With what?  With
16 what your interpretation of it is?  She can't agree
17 or disagree with what your interpretation of that
18 is.
19        MR. ANWAR:  Listen, I've asked you
20 multiple times to please --
21        MR. THORNBURGH:  But you're asking an
22 impossible question.
23        MR. ANWAR:  You can object.  You can
24 object and then move to exclude the testimony if you
25 disagree with it.

Page 119

1        MR. THORNBURGH:  Just ask a better
2 question.
3        MR. ANWAR:  You're taking up minutes
4 into my deposition.  I'm going to reserve the right
5 to reopen the deposition just based on all the
6 speaking objections that have been made in this
7 deposition.
8        MR. THORNBURGH:  Well, it's a
9 mischaracterization.
10        MR. ANWAR:  If you want to defend the
11 speaking objections to the judge, go for it.  We're
12 in federal court.  You can object to form.
13    Q.   Sorry, did you have any -- did you have a
14 response to my last question?
15    A.   Can you ask the question again?
16        MR. ANWAR:  Could you just read the
17 last question back for me, please.
18        (Record read.)
19        MR. THORNBURGH:  Totally object on
20 the same basis.  She can't agree or disagree with
21 what you saw or how you interpreted what you saw.
22    Q.   You can answer.
23    A.   Well, I disagree with you because it
24 talks how a midurethral sling can help.
25    Q.   Okay.  We can move on.  Thank you.  You

Page 120

1 can put that aside.
2        So did Dr. Cowles give you any
3 other information or brochures?
4        MR. THORNBURGH:  Objection.
5    A.   She gave me this brochure, and she gave
6 me the brochure about the ablation, what was going
7 to happen on the ablation.  And then --
8    Q.   Go ahead.  I'm sorry.
9    A.   She just talked about how this was going
10 to help.  And I felt confident, she felt confident,
11 and my husband felt confident about this sling
12 procedure that we agreed to have done.
13    Q.   Was the ablation brochure that she gave
14 you, was that a Boston Scientific brochure, do you
15 know?
16    A.   That was an ablation brochure that she
17 had in her office, explaining how the ablation
18 procedure works.
19    Q.   So it wasn't a Boston Scientific
20 brochure?
21    A.   It was her brochure.
22    Q.   Okay.  Fair enough.  Prior to the surgery
23 with Dr. Cowles, the placement of the sling, did you
24 do any other research or any Internet research about
25 slings or placement of slings?

Page 121

1    A.   No.  We felt very confident, after
2 reading this Boston Scientific brochure, that, yes,
3 this was a good choice for me.  In talking with
4 Dr. Cowles about the procedure and talking with my
5 husband about the procedure and him reading the
6 brochure, we felt very confident to go ahead with
7 the procedure.
8    Q.   Okay.  What was your understanding of the
9 procedure itself?  Like, what specifically did you
10 understand that Dr. Cowles was going to go in and
11 do?
12        MR. THORNBURGH:  Which procedure?
13 I'm sorry.
14        MR. ANWAR:  What's that?
15        MR. THORNBURGH:  Which procedure?
16        MR. ANWAR:  The procedure performed
17 by Dr. Cowles.
18        THE WITNESS:  Which one, though?
19        MR. THORNBURGH:  You said singular,
20 and there's multiple, so --
21        MR. ANWAR:  Okay.  Let me -- let me
22 clarify my question.
23    Q.   So on November 18, 2009 Dr. Cowles
24 performed surgery on you, correct?
25    A.   Correct.

Katrina Bagwell

Page 122

1   Q.   Okay.  What was your understanding of
2  what Dr. Cowles was going in to do during that
3  surgery?
4   A.   She was going to place a bladder sling in
5  me.  And I remember her saying it's like a hammock
6  that's under your bladder, that will support your
7  bladder, so that you don't have the leakage.
8            You know, and we went through the
9  brochure, talked about it, and -- and that was
10  everything -- every question that I had about the
11  procedure was answered through the brochure.
12   Q.   Did -- did you have any understanding
13  about where the incisions would be made during the
14  surgery?
15   A.   Yes.
16   Q.   Where is that?
17            MR. THORNBURGH:  Objection.
18   A.   It was laparoscopic, was the incision
19  (indicating).
20   Q.   And you were pointing to yourself.  Could
21  you just say in words where on your body you were
22  pointing to yourself, in the pelvic region?
23   A.   In my belly.  Four incisions in my belly,
24  and then she was going up the vagina.
25   Q.   Was there any discussion or did you have

Page 123

1  any understanding about whether there would be
2  scarring from the incisions or the surgery --
3            MR. THORNBURGH:  Objection.
4   Q.   -- that Dr. Cowles performed?
5            MR. THORNBURGH:  Objection.
6   Q.   Excuse me?
7   A.   Do I answer that?
8   Q.   You can answer.
9   A.   So, you know, we talked about the little
10  incisions, the little tiny incisions on my belly.
11  You know, we talked about the care for them, just
12  the soreness that would happen after.  And she had a
13  care plan in place for the pain; if I had any pain,
14  the care plan for pain there.  Just to take it easy.
15   Q.   During the surgery where Dr. Cowles
16  placed the sling, is that the same surgery that
17  Dr. Cowles also performed the ablation that you
18  mentioned?
19   A.   Yes.
20   Q.   Okay.  So both of those procedures were
21  performed during that surgery?
22   A.   Yes.
23   Q.   Do you know, did Dr. Cowles do anything
24  else during that surgery?
25   A.   She took off some tissue.

Page 124

1   Q.   Tell me about that.  What did she do?
2   A.   It was a fibroid that she took off.
3   Q.   It was a what?
4   A.   Fibroid.
5   Q.   Okay.
6   A.   A piece of tissue.
7   Q.   Like an adhesion?  Does that sound right?
8            MR. THORNBURGH:  Objection.
9   A.   No.
10            MR. THORNBURGH:  She said fibroid.
11            MR. ANWAR:  Oh, fibroid, I'm sorry.
12   Q.   Do you know where she removed that
13  fibroid from?
14   A.   There's pictures that you can see that
15  she -- what she removed and where she removed it
16  from.
17   Q.   Do you have any understanding of where
18  she specifically removed it from?
19   A.   Yeah.  She showed me.  Like, she showed
20  me.  You know, in the OB office they have, like,
21  pictures, diagrams of the pelvic floor, so she
22  showed the general area.
23   Q.   Was it in your pelvic region?
24            MR. THORNBURGH:  Objection.
25   A.   It was, like, in my uterus kind of right

Page 125

1  there (indicating).
2   Q.   Okay.  I understand.
3   A.   And it's documented as well that doing
4  that procedure, everything went well and my pain
5  issues went away.
6   Q.   Did you have any discussion with
7  Dr. Cowles about whether the sling -- strike that.
8            Did you have any discussion with
9  Dr. Cowles about what material the Solyx sling was
10  made out of?
11   A.   Yeah.  She -- I think I remember she
12  described it was a type of mesh material that was
13  going to support my bladder like a hammock.
14   Q.   Did you understand that the mesh, that
15  was intended to be permanent?
16   A.   Yes.
17   Q.   How long were you in the hospital after
18  the surgery?
19   A.   I think it was about three days maybe,
20  two or three days.
21   Q.   And do you know, was anesthesia used
22  during the surgery?
23   A.   Yes.
24   Q.   What's your understanding of how the
25  surgery itself went?  Were there any complications?

Katrina Bagwell

Page 126

1 A. No. When she -- you know, after the
2 surgery she came and talked to me and showed me all
3 the pictures of everything. It's all the evidence
4 that you have. And she did show me those pictures,
5 and she explained how well everything went. She
6 felt really good, and I remember her saying that I
7 was going to be a new woman. You know, that I --
8 I --
9 Q. Did you have to catheterize after the
10 surgery?
11     MR. THORNBURGH: Objection.
12 A. I had a Foley put in. The Foley was put
13 in because, you know, during surgery they put a
14 Foley in you, and after the surgery they took the
15 Foley out.
16 Q. Were there any immediate postop
17 complications that you experienced or that you're
18 aware of?
19     MR. THORNBURGH: Objection.
20 A. I feel what I experienced was -- you
21 know, I had many surgeries. So I know, like, after
22 surgery, like, for me, my body takes a little bit
23 more time to -- to adjust to what has just happened
24 to my body.
25     So my understanding was my body

Page 127

1 was adjusting to all the procedures that were
2 just -- that I just had encountered.
3 Q. How were your symptoms and your issues
4 with incontinence when you left the hospital?
5 A. When I left the hospital, I was able to
6 pee. You know, they gave me pain meds to treat that
7 whole -- they gave me instructions, just the normal
8 things after surgery, to relax, take your pain meds,
9 that kind of thing.
10 Q. Did you experience any relief from this
11 urinary incontinence after the surgery?
12 A. Well --
13 Q. And specifically the one with Dr. Cowles?
14 A. As it's documented in the files, it
15 states, you know, I was going in to see her. I had
16 no more bleeding. I had no more cramping. I had no
17 more painful sex. I had -- I didn't have any more
18 leakage. So, you know, it was just the process of
19 getting back into everything.
20 Q. Did you have any other -- strike that.
21     Had the issues with incontinence
22 resolved after the surgery as well?
23     MR. THORNBURGH: Objection.
24 A. At that time there was no leakage.
25 Q. And when you say at that time, would you

Page 128

1 say within the first couple months after surgery?
2 A. Correct.
3 Q. How long after the surgery did you start
4 experiencing symptoms again, either issues with pain
5 or incontinence?
6 A. Well, I continued to work. But during
7 work, you know, I would have little pains, you know,
8 and I thought it's my body adjusting to what has
9 happened because of the surgeries. So yes, it was
10 that kind of pain.
11 Q. Do you know how long it was after the
12 surgery that you felt like there was a problem or
13 your symptoms returned?
14     MR. THORNBURGH: Objection. Which
15 symptoms?
16 Q. Any of the symptoms that you're claiming
17 in the lawsuit?
18 A. Well, from when I had the surgery to
19 2014, during that block I continued to work, but I
20 had to take FMLA intermittently throughout all those
21 years. Every year I had -- I took 12 weeks out of
22 the year because of -- you know, I didn't understand
23 what was happening with my body. Like --
24 Q. Why were you taking the FMLA?
25 A. Well, what was happening at the time was

Page 129

1 pain and discomfort. I couldn't sit for long. And
2 so my work and my doctors both worked together to
3 accommodate me at work.
4     You know, working a shift of 12
5 hours, you have to be on your feet. And, like, our
6 breaks are so precious to us, just to be able to sit
7 or whatever, you know, just to relax for a minute.
8 So they had to prescribe a ball so that I could have
9 a sit ball. They had to get an okay from HR to have
10 a room for me so that I could lay flat and lay down
11 during my breaks.
12     I mean, they had to go way, way
13 high up at work to get approval for me to do this.
14 But they did it because they wanted to keep me on at
15 work because I was a valued employee.
16 Q. How soon after the surgery, the one with
17 Dr. Cowles in November of 2009, did you have to go
18 on FMLA? I think you said you did at least once a
19 year?
20 A. See, I was on it when I went for my
21 surgery for 2009, and that continued for 12 weeks
22 because I was off of work. And then I was able to
23 go back to work.
24     And then the next year, like, I
25 wasn't able to be on my right side at all. I always

Katrina Bagwell

Page 130

1 had to lean to my left side. And each year -- each
2 year it was just getting worse and worse and worse.
3    Q.   What did Dr. Cowles -- did you go see
4 Dr. Cowles --
5    A.   Uh-huh.
6    Q.   -- when it was getting worse?
7    A.   Yeah. I kept seeing Dr. Cowles and, you
8 know --
9    Q.   And what did she tell you?
10        MR. THORNBURGH: Hold on. She was
11 speaking. You're speaking over each other.
12        MR. ANWAR: She can speak.
13    A.   I kept seeing Dr. Cowles and, you know,
14 the treatment was my body adjusting to the procedure
15 that I had done -- what was the question again?
16    Q.   The question was what did Dr. Cowles tell
17 you about why you were experiencing the symptoms
18 that you were?
19    A.   Yeah, that's why. My body -- like, I
20 know my body too, and I know it takes a while for it
21 to -- like, the procedures that I had done, for it
22 to adjust to what was just done to me.
23    Q.   Okay.
24    A.   And that, you know, just to continue
25 doing what I'm doing with her working, with my work,

Page 131

1 and accommodating me every way that they could so
2 that I could continue to work.
3    Q.   In your Fact Sheet, I'll represent to
4 you, and we'll -- I'll show this to you a little
5 later in the dep. In response to a question about
6 when you first attribute the bodily -- the injuries
7 that you're claiming to the mesh, it says, "I
8 approx" -- or, "I recall approximately 2011 or 2012
9 my surgeon told me that the sling may be too tight
10 and it may take a few years, just to wait and
11 relax."
12        Was that -- is that -- is that a
13 conversation you had with Dr. Cowles?
14    A.   No. It -- it was -- I talked to a lot of
15 surgeons in the hospital because the floors that
16 I -- all the different floors that I work on,
17 surgeons, doctors, nurses. In talking, I don't
18 remember with who, which surgeon or doctor, but they
19 talked about, you know, the sling and said that --
20 that doesn't sound right. I think that, you know,
21 those things get tighter over time. You should
22 research it more.
23        And then that's when I remember
24 going home, turning on the TV summer of 2011, that
25 commercial. Just that commercial. And it was like

Page 132

1 this person, commercial guy, was talking to me and
2 saying -- and me listening, that that's me. Those
3 are my symptoms. That is what's going on.
4        So I was just putting puzzle
5 pieces together, like, with what surgeons I had
6 talked with on the floor and my symptoms and the
7 commercial. That's when it just -- I really just
8 was...
9    Q.   Okay. You don't recall which surgeon or
10 which doctor told you that they thought the sling
11 might be too tight?
12        MR. THORNBURGH: Objection.
13    A.   No. It was -- I talked to multiple
14 surgeons and multiple doctors, and I don't recall.
15    Q.   Okay.
16        MR. ANWAR: Can we take a quick
17 break.
18        MR. THORNBURGH: Sure.
19        (Break from 1:49 p.m. to
20             1:51 p.m.)
21 BY MR. ANWAR:
22    Q.   We are back on the record from a short
23 break. Mrs. Bagwell, are you good to continue?
24    A.   Yes.
25    Q.   Okay.

Page 133

1        (Exhibit No. 9 was marked.)
2    Q.   I am going to hand you what has been
3 marked as Exhibit 9, or your counsel will pass you
4 what's been marked as Exhibit 9.
5        And I'll represent to you that --
6        MR. THORNBURGH: Just note my
7 objection. It's very difficult to read with the
8 small font.
9        MR. ANWAR: Okay.
10        MR. THORNBURGH: It looks like the
11 image shrunk.
12        MR. ANWAR: Understood.
13        MR. THORNBURGH: Just for the record.
14    Q.   I will represent to you that these are
15 consent documents related to the surgery that you
16 had with Dr. Cowles in November of 2009.
17        I wanted to ask you. On the first
18 page there, is that your signature at the bottom
19 where it says "Patient/Responsible Party"?
20    A.   Yes, it is.
21    Q.   Okay. And then on the second page there,
22 is that also your signature at the bottom where it
23 says "Patient/Responsible Party"?
24    A.   Yes, it is.
25    Q.   Okay. Heading into the surgery with

Katrina Bagwell

1  Dr. Cowles -- I know you have a nursing background.
2       MR. THORNBURGH:  Objection.
3    Q.   Did you --
4       MR. THORNBURGH:  Objection.
5  Mischaracterization of her background.  She's a
6  certified nurse's assistant.
7       MR. ANWAR:  Fair enough.
8    Q.   I know you have a background as a
9  certified nurse assistant.
10          So heading into the surgery with
11  Dr. Cowles, did you understand that all surgeries
12  have risks?
13   A.   Yes, I understood that.
14   Q.   And you understood that there's no such
15  thing as a risk-free surgery?
16      MR. THORNBURGH:  Objection.
17   A.   Well, I've been through many surgeries
18  so, yes, I understand.
19   Q.   You understood death is a risk of
20  surgery?
21      MR. THORNBURGH:  Objection.
22   A.   With any surgery.
23   Q.   With any surgery, correct?
24      MR. THORNBURGH:  Objection.
25  Mischaracterization.

1    A.   So I feel with any surgery there's a
2  risk.
3    Q.   I'm sorry, could you repeat that?  I
4  didn't hear it.
5    A.   I feel that with surgery, I signed it, so
6  I know the risk.
7    Q.   Okay.  Would you agree that your mesh
8  surgery, like any surgery, carried with it risks?
9    A.   Yes, I knew the pain that was going to
10  come after the surgery.  I knew the care plan that
11  was going to be involved because of the pain after
12  the surgery.
13   Q.   Did you have a discussion with Dr. Cowles
14  about the risks of the surgery?
15      MR. THORNBURGH:  Objection.
16   A.   Yeah.  You know, she said I would have
17  possible pain after, but I knew what was to come
18  from her treatment plan to help with the pain for
19  after surgery or any just type of discomfort.
20   Q.   Did you have a discussion with Dr. Cowles
21  specifically about the risks of mesh placement?
22   A.   Well, I was given this brochure that
23  talked about pretty much everything.  In talking
24  with Dr. Cowles about the procedure, I felt
25  confident, she felt confident, and my husband felt

1  confident in the procedure and the risks involved
2  and the treatment that was going to be given for the
3  pain, if any, after, you know.
4    Q.   And just looking at the second page, the
5  consent for the operation or procedure with
6  Dr. Cowles, the surgery, under Risks it states that,
7  "The more common risks include infection, bleeding,
8  including severe loss of blood requiring a blood
9  transfusion, nerve injury, blood clots, heart
10  attack, allergic reactions and pneumonias.  These
11  are not all the possible risks associated with this
12  procedure, but these risks can be serious and
13  possibly fatal.
14          Since you signed the document, I
15  assume you understood that, correct?
16   A.   Correct.
17   Q.   Okay.  Did you talk with Dr. Cowles about
18  the possibility for the need of subsequent sort of
19  revision or removal surgery related to mesh?  Was
20  there any discussion about that?
21   A.   No.
22   Q.   You mentioned there was some discussion
23  about pain that you would experience after surgery.
24  Was there any discussion about how long that pain
25  would last?

1    A.   It was my understanding that the pain,
2  you know, was because of the procedures that I was
3  having done.  My understanding was with her care
4  plan in place to help with pain, that it wasn't
5  going to be a permanent thing.  It was just, you
6  know, the surgical procedure and what was happening
7  to my body.
8    Q.   Did Dr. -- was there any discussion about
9  the risk of possibly continued pain, even past the
10  recovery period, related to placement of the mesh?
11   A.   No.
12   Q.   If Dr. Cowles would have told you that
13  one of the risks of a mesh placement surgery is
14  continued pain and the possible need for subsequent
15  surgery to remove the mesh, would you have -- would
16  you have agreed to move forward with the surgery?
17   A.   I just need to sit up.
18      MR. THORNBURGH:  You need to stand
19  up?
20      THE WITNESS:  Yeah.
21      MR. THORNBURGH:  Re-ask the question.
22      MR. ANWAR:  Okay.
23   A.   Can you repeat the question?
24   Q.   Sure.
25          If Dr. Cowles would have told you

Katrina Bagwell

Page 138

1 that continued pain, ongoing pain, is a risk of mesh
2 placement surgery, as well as the possibility, the
3 risk of subsequent surgery to remove part of the
4 mesh was a risk of mesh placement surgery, would you
5 have agreed to move forward with the surgery?
6    A.   If I would have known that this would
7 alter my life the way that it has, with continuous
8 chronic pain, with no intimacy with my husband, with
9 me not being able to sit, with me not being able to
10 ride my bike.  I mean, we moved up here for the
11 mountain life, to go canoeing, to go mountain
12 biking, all of that.  Had I known any of that, no, I
13 would not have.
14    Q.   Okay.  I have a few more questions for
15 you.  I'm a little short on time.
16        First I'm going to hand you what's
17 been marked as Exhibit 10.
18        (Exhibit No. 10 was marked.)
19        MR. THORNBURGH:  I have a copy of
20 that.
21    Q.   I'll just represent to you that this is a
22 copy of the Plaintiff Fact Sheet that you submitted
23 in this lawsuit.  If you could turn to the very last
24 page.  Is that -- under Verification, where it
25 states, "I declare under penalty of perjury," that

Page 139

1 you've reviewed it and verified that the information
2 is true and correct to the best of your knowledge
3 and information, is that your signature there?  Is
4 that the signature of plaintiff?
5    A.   Yes.
6    Q.   Okay.  And do you know, is that your
7 husband's signature there below it?
8    A.   Yes.
9    Q.   Okay.  So at the time that you submitted
10 that Fact Sheet in December 03 of 2018, was it --
11 did you provide the best and most accurate
12 information to the best of your ability?
13    A.   Yes.
14    Q.   Okay.
15        MR. THORNBURGH:  For the record, she
16 also brought a copy with her.
17        MR. ANWAR:  Okay.
18        MR. THORNBURGH:  And there was one
19 section that she had marked --
20        MR. ANWAR:  Okay.
21        MR. THORNBURGH:  -- as a revision.
22        MR. ANWAR:  Why don't we go ahead and
23 mark that as an exhibit, if we have it.
24        MR. THORNBURGH:  I'm not sure where
25 that is.  We gave it to you, I think.

Page 140

1        MR. ANWAR:  You did?
2        MR. THORNBURGH:  I thought we gave it
3 to you when we first arrived.  It may be over there
4 to the left?
5        MR. ANWAR:  No, I don't think so.  We
6 can -- we can come back to that.  I just have a
7 couple of questions.
8        MR. THORNBURGH:  I just want to note
9 for the record that there were some revisions
10 provided to you.
11        MR. ANWAR:  Sure.  And as we conclude
12 the deposition, we'll find it and we'll mark that as
13 an exhibit.
14        MR. THORNBURGH:  Sure.  Sure.
15    Q.   Now, I understand that ultimately you
16 ended up going to see Dr. Brian Flynn to have some
17 of your mesh removed; is that correct?
18    A.   Correct.
19    Q.   Okay.  And I believe you had a surgery in
20 April of 2014, correct, with Dr. Flynn?
21    A.   Two.
22    Q.   I was saying in April specifically.
23    A.   April 10th of 2014.
24    Q.   Okay.  Thank you.  And then you had
25 another surgery with Dr. Flynn in September?

Page 141

1    A.   Yes.
2    Q.   On September 18 of 2014?
3    A.   Yes.
4    Q.   Okay.  And during both of those
5 procedures, is it your understanding that he removed
6 portions of the mesh?
7    A.   Yes.
8    Q.   Okay.  At any point during -- at any
9 point after either of those surgeries did your
10 symptoms improve at all?
11    A.   Well, when Dr. Flynn did the first
12 surgery, I was able to urinate.  But then during
13 intercourse my husband felt something, and it would,
14 like, scrape -- it was so weird when he would -- his
15 penis would come out, it was kind of like some kind
16 of sensation he would have.  He would feel, like, a
17 scrape.
18        And then I started going to
19 physical therapy.  And physical therapy, her first
20 time inside doing the internal massage, you know, I
21 went through the roof.  And she said, "Katrina,
22 there's something there.  It's the mesh is still
23 there."
24        So that's why I went back to
25 Dr. Flynn.  And he said, "Oh, yeah, you know, we've

Katrina Bagwell

Page 142

1  got to do a second surgery to fix that."
2      Q.   After your second surgery, I understand
3  that he had you do the pelvic floor therapy.  Did
4  your symptoms improve after -- at any point after
5  the second surgery?
6      A.   I was unable to go back to work.  I still
7  couldn't go back to work.
8      Q.   And I'll just represent to you that I've
9  seen the therapy records as well as we spoke with --
10  we saw Dr. Flynn's record and took his deposition.
11          And my understanding of the
12  records and the deposition, I'm sure counsel will
13  disagree, was that there was a period of time where
14  your symptoms started to improve leading up to 2016.
15  Does that sound right to you?
16      A.   Disagree.  It was like a roller coaster.
17  It was like I would get better, and there were
18  points where I had this -- this good feeling of, oh,
19  maybe I'll be able to go back to work.  Just maybe
20  and, you know, feeling good.  But then just crashed.
21          Like, I would try certain things,
22  like sitting longer or driving.  And those things
23  would just -- just send my pain into a downward
24  spiral.  And so it was just like up and down kind
25  of, just depending on what I was doing, my

Page 143

1  treatment.
2          My pelvic floor doctor, just many
3  things that we have done, many medications, which
4  I'm sure you have the records.  I must have a stack
5  this high (indicating) with all of the medications.
6  And I would have a stack this high (indicating) of
7  all the care plans, all the treatments that I've
8  done.
9      Q.   I just have one final question for you.
10  I realize we're limited on time.
11          MR. THORNBURGH:  We're actually out
12  of time.
13          MR. ANWAR:  And I just have one final
14  question.  I ask that you bear with me because I've
15  tried to be respectful in giving her an opportunity
16  to say whatever she'd like as well as your speaking
17  objections.
18      Q.   My last question is:  As you sit here
19  today, has any health care provider or doctor
20  recommended to you to have any subsequent surgery to
21  treat your issues or remove any remainder of the
22  mesh?
23      A.   Okay.  So recently I went to Dr. Flynn
24  because I'm thinking maybe time will advance the
25  things that they can do to help fix this problem.

Page 144

1  But Dr. Flynn said that he wouldn't even perform a
2  surgery on his own wife, his own daughter.  So, yes,
3  I have gone to Dr. Flynn.
4          I have the anchors in me.  I have
5  fragments of the mesh in me still, and there is
6  nothing that nobody can do.  There's no amount of
7  money that's going to fix me, and I'm angry.  I am
8  very angry.
9      Q.   Well, we appreciate your time today.  I
10  appreciate you talking with us.
11          MR. ANWAR:  And I will pass the
12  witness.
13          MR. THORNBURGH:  Let's take a break.
14          MR. ANWAR:  Okay.
15          MR. THORNBURGH:  I may or may not
16  have follow-up questions.
17          (Break from 2:08 p.m. to
18               2:13 p.m.)
19          MR. THORNBURGH:  I don't have any
20  questions.
21          I just want to -- I have no
22  questions for Mrs. Bagwell, who has both stood and
23  laid down during this entire deposition because of
24  the pain.  So we're trying to get her out of here as
25  quickly as we can.

Page 145

1          We are going to mark a couple of
2  exhibits.  There's a Plaintiff Fact Sheet with one
3  revision.  I think by Mr. Bagwell, to Question
4  No. 11 -- I'm not sure if that's the section --
5  Question No. 11, regarding the loss of consortium.
6  And so it's my understanding that for the most part
7  there will be a claim for loss of consortium, both
8  for loss of services of spouse, impaired sexual
9  relations, lost wages, lost earning capacity,
10  out-of-pocket expenses, psychological and emotional
11  injuries as well.
12          So that will be marked as Exhibit
13  No. 11.
14          (Exhibit No. 11 was marked.)
15          MR. THORNBURGH:  Exhibit No. 12 will
16  be a photograph, so 12 will be a placeholder until
17  we -- we're taking photographs of the items, tools,
18  items that assist Mrs. Bagwell through her pain and
19  her daily activities.  So that will be Exhibit
20  No. 12.
21          MR. ANWAR:  I would -- that's fine
22  with me.  I would just, for the record, put an
23  objection to the extent any of that would be
24  considered testimony.
25          MR. THORNBURGH:  Just marking them.

Page 146

1       (Exhibit No. 12 was marked.)

2       (Whereupon, the deposition concluded at

3       2:15 p.m., April 24, 2019.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 147

1       SIGNATURE OF WITNESS

2

3       I, KATRINA BAGWELL, the witness in the

4 above deposition, have read the within transcript of my

5 testimony.  I have made _____ changes in said testimony

6 and have stated such changes (if any) and the reason

7 for each change on a separate sheet attached to this

8 transcript.  My testimony as given herein is true and

9 correct, to the best of my knowledge and belief.

10

11

12

13     _____

14     KATRINA BAGWELL

15

16 Subscribed and sworn to before me this _____ day of

17 _____, 2019.

18

19     _____

20     Notary Public

21

22 My commission expires _____.

23

24

25

Page 148

1  - AMENDMENT SHEET -

   Deposition of KATRINA BAGWELL

2 taken on April 24, 2019

   The deponent wishes to make the following changes in

3 the testimony as originally given:

4 PAGE/LINE    SHOULD READ     REASON FOR CHANGE

5 _____ _____

6 _____ _____

7 _____ _____

8 _____ _____

9 _____ _____

10 _____ _____

11 _____ _____

12 _____ _____

13 _____ _____

14 _____ _____

15 _____ _____

16 _____ _____

17 _____ _____

18 _____ _____

19 _____ _____

20 _____ _____

21 Subscribed and sworn to before me this _____ day of

   _____, 2019.

22

23     _____

24     Notary Public

25 My commission expires _____.

Page 149

1       REPORTER'S CERTIFICATE

2       I, LEEANN L. STELLOR, Registered Merit

3 Reporter and Certified Realtime Reporter within

4 Colorado, ID 200401669, appointed to take the

5 deposition of KATRINA BAGWELL, do hereby certify that

6 before the deposition she was duly sworn by me to

7 testify to the truth; that the deposition was taken by

8 me at 13438 Berry Hill Lane, Pine, Colorado; then

9 reduced to typewritten form herein; that the foregoing

10 is a true transcript of the questions asked, testimony

11 given and proceedings had.

12

13       I further certify that I am not related to

14 any party herein or their Counsel, and have no interest

15 in the result of this litigation.

16

17       In witness hereof I have hereunto set my

18 hand this 6th day of May, 2019.

19

20     _____

      Leeann L. Stellor

21     Registered Merit Reporter

      Certified Realtime Reporter

22     and Notary Public

23

24 My commission expires June 8, 2020

25