## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-cv-02656-RM-SKC

Katrina Bagwell and Luke Bagwell,

    Plaintiffs,

vs.

Boston Scientific Corporation,

    Defendant.

---

## AMENDED FINAL PRETRIAL ORDER

---

## 1. DATE AND APPEARANCES

The final pretrial conference is scheduled for February 11, 2021 at 11:00 a.m. Daniel Thornburgh and Brad Bradford of Aylstock, Witkin, Kreis, and Overholtz, PLLC will appear on behalf of the Plaintiffs Katrina Bagwell and Luke Bagwell. Heather Perkins and Hannah Carter of Faegre Drinker Biddle & Reath LLP will appear on behalf of Defendant Boston Scientific Corporation.

## 2. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1332 because Defendant is a citizen of Delaware and Massachusetts while Plaintiffs are citizens of Colorado, and the amount in controversy exceeds $75,000.00.

## 3. CLAIMS AND DEFENSES

**By Plaintiff**

I. Overview of Plaintiff's Factual Contentions

This trial involves product liability related claims against Defendant Boston Scientific Corporation (hereinafter "Defendant") and its Solyx Single-Incision System (hereinafter "Solyx"). On November 18, 2009, Dr. Cheryl Cowles surgically implanted the Solyx into Plaintiff Katrina Bagwell (hereinafter "Mrs. Bagwell") for treatment of stress urinary incontinence. Plaintiffs will establish at trial that Defendant failed to adequately inform Mrs. Bagwell, her physicians, and the medical community about the permanent, severe risks associated with the Solyx. Specifically, Defendant failed to inform Mrs. Bagwell or any of her treating physicians about the severity and frequency of complications, the difficulty in treating those complications, the risks associated with removing or revising the mesh, and the detrimental, lifelong impacts associated with the Solyx. Accordingly, Mrs. Bagwell's physicians were unable to disclose the Solyx's true risks to Mrs. Bagwell, and Mrs. Bagwell did not receive adequate information to consent to the permanent implantation of the defective device. Due to Defendant's actions, Mrs. Bagwell's life has been permanently altered to her detriment, her husband's detriment, and her children's detriment. She has suffered tremendous, lifelong injuries, including chronic pelvic pain, dyspareunia (i.e. painful intercourse), disfigurement and the mental difficulties caused by her injuries.

Solyx Single-Incision System

On May 2, 2008, Defendants submitted its 510(k) clearance application with the FDA for the Solyx Single-Incision System. The FDA granted clearance on August 27, 2008, and the

2

Solyx was launched to market on December 5, 2008. The Solyx is a single incision mini sling composed of polypropylene mesh that was designed to treat stress urinary incontinence. Stress urinary incontinence is the involuntary loss of urine during routine activities like running, jumping, coughing, sneezing, or any other physical activity that tends to increase abdominal pressure. Defendant marketed the Solyx as a single incision mini sling system that was designed to offer a procedure with fewer steps and less reduced dissection, yet no clinical trials were conducted prior to the launching the Solyx device because Defendant was concerned with the financial cost of performing such studies. The implantation of the Solyx sling involves a vaginal incision, and the mesh is implanted under the urethra to provide additional support to help reduce or eliminate urine leakage. However, the Solyx is defective in three primary areas: material, methods, and label.

As a preliminary matter, the evidence at trial will establish that the Solyx's composition material is a defective polypropylene mesh. Phillips Sumika, the manufacturer of polypropylene resin used in Solyx, warned Defendant: "Do not use this Chevron Phillips Chemical Company LP material in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues." Despite this, Defendant proceeded in manufacturing the Solyx sling using Phillips Sumika's Marlex polypropylene resin.

When Phillips Sumika became aware of Defendant's use of its resin, it refused to continue to provide the Marlex resin to Defendant. After some negotiations, Phillips Sumika entered into a one-year agreement with Defendant during which Phillips Sumika would continue to supply the resin. However, the agreement required Defendant to indemnify Phillips Sumika for Defendant's decision to use the resin in medical applications. The agreement further required

3

Defendant to conduct any and all necessary testing to assure safety. Yet, Defendant never conducted the necessary studies and, in 2005, just before the agreement with Phillips Sumika expired, Defendant purchased a ten-year supply of the resin. Marlex resin should not have been used in the Solyx and its use compromised patient safety.

Moreover, Defendant designed the Solyx with heavy weight small pore synthetic plastic polypropylene mesh material even though Defendant knew that such a design would cause a high rate of complications in women implanted with it. Defendant ignored important safety information concerning heavyweight mesh small pore mesh. By the time Defendant began designing Solyx, it was well known that heavyweight, small pore mesh, and in particular Marlex mesh, causes fibrotic bridging, which leads to scar plates, mesh encapsulation, shrinkage and contraction; these properties draw nerves closer to the implantation of the sling and exacerbates the wound healing process. Lightweight, large pore mesh designs, on the other hand, reduces these risks significantly.

Dr. Bruce Rosenzweig and Dr. Ralph Zipper will testify that the implantation of Defendant's defective polypropylene mesh into the human body is associated with acute and chronic inflammation, chronic foreign body reaction, bridging fibrosis, mesh encapsulation, excessive scarring, nerve entrapment, pudendal nerve neuralgia, obturator neuralgia, pelvic myofascial pain syndromes, pelvic floor dysfunction, chronic and debilitating pelvic pain, dyspareunia (painful sex), apareunia (inability to have sex due to pain), degradation, loss of elasticity, urinary dysfunction and the need for multiple surgical procedures to remove the defective material which is impossible to safely and completely remove and which causes further damage to vaginal tissue already damaged by the defective nature of the Solyx.

4

Furthermore, scientific literature has overwhelmingly established that the defective Marlex polypropylene plastic material that makes up the Solyx is subject to oxidation and degrades by an oxidative mechanism in the body making it incompatible overtime with soft pelvic tissue. The oxidative properties of the Solyx cause the already stiff mesh to become stiffer. This causes chemical changes and reduced compliance amongst the surrounding tissue, which leads to pain, inflammation, and erosion and extrusion of the plastic mesh into the vaginal canal. Defendant ignored Solyx's propensity for oxidation—and the detrimental effects of it—during design. Moreover, prior to marketing the Solyx, several studies had shown that the mesh material was subject to shrinking 30%-50% after 4 weeks of implantation, abdominal wall stiffening following mesh insertion, and polypropylene fibers are subject to cracking and peeling.

Additionally, the evidence at trial will establish that Defendant's methods regarding the Solyx are defective. As discussed above, the implantation of the Solyx sling involves a vaginal incision, and the mesh is implanted under the urethra to provide additional support to help reduce or eliminate urine leakage. However, Dr. Zipper will testify that the methods taught by Defendant for the implantation of the Solyx are defective because surgeons are instructed to pull the mesh material through and attach it to pelvic muscles, including the levator ani and obturator membrane and muscles which cause some women to experience debilitating injuries, including but not limited to permanent and irreparable pelvic myofascial pain syndromes and pudendal nerve neuralgia.

Moreover, the evidence presented at trial will show that the Solyx's label is defective. Dr. Rosenzweig and/or Dr. Zipper will testify that the Solyx label in effect at the time of Mrs. Bagwell's surgery is defective in a number of ways. For instance, the label at the time Ms.

US.131631310.01

Bagwell was implanted with the Solyx device did not warn that the device can cause permanent and irreparable:

- pudendal nerve neuralgia;

- pelvic myofascial pain syndromes;

- severe pelvic pain;

- pelvic floor dysfunction;

- dyspareunia or apareunia;

- urinary dysfunction; or

- scarring.

The label also does not warn that multiple surgeries may be required to remove the Solyx mesh and that complete removal may not be possible. The label fails to provide meaningful direction or instruction regarding the possibility of chronic and persistent mesh erosions and extrusions into the vagina or the appropriate treatment to care for chronic and persistent conditions. It is also defective in failing to inform medical providers or patients of all adverse events related to the Solyx. Overall, the label is devoid of any indications that the Solyx would cause permanent, severe, life-altering injuries of any kind, and had Mrs. Bagwell been adequately informed regarding those permanent, severe, life-altering risks, she would not have consented to having the Solyx implanted.

Mrs. Bagwell's Medical Treatment

On November 18, 2009, Mrs. Bagwell presented to Lutheran Medical Center for treatment of her stress urinary incontinence with Solyx mesh placement by Dr. Cowles. As highlighted above, there is no evidence or suggestion that Dr. Cowles did anything wrong during

6

the procedure. Following implantation of the Solyx sling anchors, Dr. Cowles noted that there was good seating of the sling in good position.

On December 29, 2009—approximately six weeks following the implantation of the Solyx—Mrs. Bagwell had a post-operative check-up with a physician at Dr. Cowles' office. It was noted that Mrs. Bagwell was having significant issues and pain, including pain with intercourse, and she had previously visited the emergency room on two separate occasions to help deal with the discomfort. The physician also noted that the pain Mrs. Bagwell experiencing before the surgery had resolved, but she was experiencing a different pain with vaginal discomfort.

Mrs. Bagwell presented to Dr. Cowles' office again on January 11, 2010 with complaints of pelvic pressure, burning, and swelling. It was also noted that intercourse had been uncomfortable for Mrs. Bagwell, and her husband, Luke, "can feel something". Upon examination, Mrs. Bagwell's incision had completely healed, and there was no extrusion of mesh at the incision sight or upon palpation.

On March 18, 2011, Mrs. Bagwell visited her primary care physician, Dr. Cohen, after experiencing several urinary tract infections. Her physician's note indicated that Mrs. Bagwell was informed that her Solyx sling may be too tight, which can cause more frequent infection. Dr. Lisa Cohen referred Mrs. Bagwell to the department of urology. Upon referral, Dr. Cohen indicated that Mrs. Bagwell's surgeon told her that symptoms would resolve within a year, however, Mrs. Bagwell was still experiencing cramping, pain with urination, and frequent urinary tract infections.

US.131631310.01

On July 5, 2011, Mrs. Bagwell was seen by urologist, Dr. Mina Lee, for complaints of urethral pain, vaginal pressure, urgency, frequency, dysuria, voiding in small amounts, and incontinence when sneezing and coughing. A pelvic examination was deferred, and a cystoscopy and CT scan were scheduled. Dr. Lee performed a pelvic examination and cystoscopy on July 28, 2011. The pelvic examination was unremarkable, and the cystoscopy was negative.

On August 29, 2011, Dr. Lee saw Mrs. Bagwell for a follow up of her urinary issues. Mrs. Bagwell reported complaints of pelvic pressure and pain, specifying that it hurt to sit down. Dr. Lee did not believe that Mrs. Bagwell's pain was attributed to the implantation surgery of the Solyx, and she recommended Mrs. Bagwell attend pelvic floor physical therapy. Dr. Lee's referral to physical therapy included a diagnosis of retention, urgency, female pelvic pain, and pelvic congestion syndrome.

On September 29, 2011, Mrs. Bagwell had her first physical therapy appointment. The pelvic examination revealed tenderness upon palpation of the bladder and tenderness in the entire region of the pelvic floor muscle. The short-term goal of physical therapy was for Mrs. Bagwell to be able to sit for ten minutes without shifting positions while the long-term goal was that she be able to walk for twenty minutes without the need to sit down. To date, Mrs. Bagwell has undergone over 100 physical therapy sessions. Her symptoms, however, continue to recur.

Mrs. Bagwell continued to experience severe pelvic pain for years. On October 28, 2013, she saw Dr. Samson Shen, a urology associate of Dr. Lee. Dr. Shen noted that Mrs. Bagwell saw Dr. Lee in 2011 and that Mrs. Bagwell continued to struggle with pain and voiding dysfunction. Dr. Shen recommended that Mrs. Bagwell use intermittent catheterization at least once to twice

8

per day to help empty her bladder and relieve her pressure symptoms. Approximately two weeks later, Dr. Shen prescribed Tramadol for Mrs. Bagwell's pelvic pain.

On January 18, 2014 Mrs. Bagwell was seen by a new primary care physician, Dr. Nichole Mah.[1] Dr. Mah noted Mrs. Bagwell's continual use of a catheter and her ongoing pelvic pain and recurrent infections. Dr. Mah did not perform a pelvic examination, but she concluded that attempted removal of the Solyx is indicated.

On February 14, 2014, Mrs. Bagwell presented to urogynecologist, Dr. Brian Flynn. Dr. Flynn documented the history of Mrs. Bagwell's present illness, and performed a physical examination, which Mrs. Bagwell found to be painful. Thereafter, Dr. Flynn recommended aggressive surgical treatment to remove the mesh since Mrs. Bagwell had been in constant pain and was unable to have intercourse.

On April 10, 2014, Dr. Flynn proceeded in performing partial removal of the Solyx sling. He documented that the removal of the mesh sling was due to complications of polypropylene mesh, and he testified that he stands by that conclusion. On May 14, 2014, Dr. Flynn saw Mrs. Bagwell for a post-operative check where Mrs. Bagwell reported she was having constant right-sided groin pain, and she was having difficulty sitting or lying down on that side. Dr. Flynn ordered Mrs. Bagwell for post-operative physical therapy, but therapy did not alleviate her pain.

On July 16, 2014, Mrs. Bagwell presented to Dr. Neil Gerig, a urologist specializing in pelvic pain. Dr. Gerig opined that Mrs. Bagwell's residual pain was secondary to urinary

---

[1] The change in primary care physician was secondary to a change in Mrs. Bagwell's health insurance.

retention, which is a complication of the Solyx device. Dr. Gerig added a number of pain management medications to Mrs. Bagwell's regimen.

On August 6, 2014, Mrs. Bagwell returned to Dr. Flynn for evaluation of her ongoing transvaginal mesh pain. Dr. Flynn noted that the initial mesh removal helped significantly, but Mrs. Bagwell was still experiencing residual significant pain. Dr. Flynn also noted that physical therapy did not help Mrs. Bagwell, and he was going to perform a total mesh explant. On September 18, 2014, Dr. Flynn proceeded with an attempted removal of the right sided Solyx anchor and portion of the Solyx mesh, but the pathologist identified no anchor or mesh excised from the surgery.

In January 2015, Mrs. Bagwell began a series of treatments involving trigger point injections and nerve blocks. However, none of the procedures (in addition to the continued physical therapy and various medications) relieved Mrs. Bagwell of her symptoms or pain.

As a result of the implantation and subsequent partial removal of the Solyx device, Mrs. Bagwell suffered severe injuries, which continue to date. Specifically, Mrs. Bagwell has suffered from chronic and debilitating pudendal nerve neuralgia, excessive scarring, chronic pelvic pain, groin pain, rectal pain, sitting pain, dyspareunia, apareunia, urinary retention, urinary urgency and frequency, urinary incontinence, and recurrent urinary tract infections. Mrs. Bagwell is unable to sit for more than ten to twenty minutes, unable to drive substantial distances, and unable to return to work. Mrs. Bagwell must continue with weekly physical therapy sessions in order to maintain even marginal levels of improvement. As a result of her serious Solyx-related injuries, Ms. Bagwell is a pelvic cripple and has been deemed disabled by the Social Security Administration.

US.131631310.01

Mrs. Bagwell filed her complaint in the MDL initially alleging the following claims: Negligence (Count I); Strict liability—design defect (Count II); Strict liability manufacturing defect (Count III); Strict liability—failure to warn (Count IV); Breach of express warranty (Count V); Breach of implied warranty (Count VI); Discovery rule, tolling and fraudulent concealment (Count VII); and Punitive damages (Count VIII). In response to Defendant's motion for summary judgment, Plaintiffs expressed that they do not intend to pursue a separate manufacturing defect claim, as such claim had been construed by the MDL court, but that Plaintiffs do intend to present evidence that Defendant's manufacturing process and the raw materials used in the manufacture of the Solyx resulted in defects in the product (in support of Plaintiffs' negligence, failure to warn, design defect, and punitive damages claims).[2]

## II. Overview of Plaintiffs' Claims

### Negligence (Count I)

Under Colorado law, the elements of a negligence claim are: (1) defendant owed a duty to the plaintiff, (2) defendant breached that duty, and (3) the breach proximately caused the plaintiff's injury. *Ayala v. U.S.*, 49 F.3d 607, 611 (10th Cir. 1995) (citing *Casebolt v. Cowan*, 829 P.2d 352, 356). Defendant owed Plaintiffs a duty to design, manufacture, market, and sell a safe medical device and to adequately warn Mrs. Bagwell's physicians about the risks associated with the device. Defendant breached that duty when it brought the Solyx to market even though Defendant knew that polypropylene mesh was not safe and intended for implantation in the

---

[2] In light of the foregoing, Plaintiffs do not incorporate a separate count for Strict Liability-Manufacturing Defect into the Final Pretrial Order. However, Plaintiff does not intend to forego, waive, or in any way agree that any *evidence related to the manufacturing process and raw materials* of the Solyx are restricted in any way.

US.131631310.01

human body. Furthermore, Defendant continued to market and sell the Solyx even though it was aware that the risks of the device tremendously exceeded any potential benefits. Because Defendant breached its duty of care to Plaintiffs, Mrs. Bagwell has suffered life-long, severe and irreparable injury.

Strict Liability – Design Defect (Count II)

Colorado adheres to the Restatement (Second) of Torts § 402A for strict liability design defect claims. *Bartholic v. Scripto-Tokai Corp.*, 140 F.Supp.2d 1098, 1106 (D. Colo. 2000) (citing *Camacho v. Honda Motor Co.,* 741 P.2d 1240, 1244 (Colo.1987) (citations omitted); *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983, 987 (1975) ("We hereby expressly adopt the doctrine of strict liability in tort which is stated in § 402A [of the Restatement (Second) of Torts].")). Accordingly, a plaintiff must establish the following elements: (1) the product is in a defective condition unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the consumer without substantial change in the condition in which it was sold; (3) the defect caused the plaintiff's injuries; (4) the defendant sold the product and is engaged in the business of selling products; and (5) the plaintiff sustained damages. *Id.* (citing *Barton v. Adams Rental, Inc.,* 938 P.2d 532, 536-37 (Colo.1997) (subsequent citations omitted). For design defect claims, the term "defect" "does not mean a mere mechanical or functional defect but is anything that makes the product 'unreasonably dangerous.'" *Armentrout v. FMC Corp.,* 842 P.2d 175, 186 (Colo.1992) (quoting *Anderson v. M.W. Kellogg Co.,* 766 P.2d 637, 643 (Colo. 1988)). To determine whether a product is "unreasonably dangerous", Colorado courts apply the risk-benefit analysis to determine "whether the risks outweigh the benefit of the product design". *Id.* at 183.

Colorado courts have discussed several non-exhaustive factors that could be considered in determining whether a products risks outweigh its benefits. Those factors include: (1) the usefulness and desirability of the product; (2) the safety aspects of the product; (3) the availability of a substitute product that would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing the product's usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product as well as the avoidability because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and (7) the feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. *Id.* at 184. These factors, however, are not exclusive, and Colorado case law does not suggest that they are to be strictly applied in every case. *Id.* Thus, the circumstances of a case are the ultimate determination in deciding which factors are necessary to be applied. *Id.* Furthermore, the question of whether a product is defective and unreasonably dangerous is an issue for the jury. *Bartholic*, 140 F.Supp.2d at 1107 (citing *Kysor Indus. Corp. v. Frazier,* 642 P.2d 908, 913 (Colo.1982)).

As discussed above, Plaintiffs will present evidence at trial demonstrating that the risks of the Solyx outweighed any potential benefit. Arguably, Mrs. Bagwell has received little to no benefit from having the Solyx implanted, and the risk of this elective procedure has greatly exceeded any benefit. Plaintiffs' experts' opinions have reached the conclusion that the Solyx's polypropylene mesh is associated with chronic inflammation, oxidation, degradation, scarring, contraction, and loss of elasticity. Dr. Zipper used objective evidence in identifying the

13

defectiveness of the Solyx's material, methods, and label. Based on Dr. Zipper's findings, the

Solyx's defects caused Mrs. Bagwell to suffer from several, life-altering injuries.

<u>Strict Liability – Failure to Warn (Count III)</u>

Under Colorado law, failure to adequately warn can "render a product, otherwise free of

defects, defective for purposes of strict liability purposes." *Staley v. Bridgestone/Firestone, Inc*.,

106 F.3d 1504, 1508 (10th Cir. 1997) (citing *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544

P.2d 983 (1975)). Internal documents and communications reveal that Defendant was aware of

several risks and complications associated with the Solyx device. For instance, email

communications between Janet McGrath, Defendant's Principal Specialist for Global Regulatory

Affairs in the Urology and Woman's Health Division, and Dr. Liping Tang, a professor at the

University of Texas at Arlington, reveal that Dr. Tang informed Defendant that the

polypropylene anchors prompted unacceptable tissue responses to the carrier mesh. Similarly,

James Goddard, Defendant's R&D Manager of the Urology and Women's Health Division,

testified in his deposition that Defendant was aware that the Solyx's polypropylene material was

not to be used in permanent implantations in the human body, and Defendant failed to share this

information with patients or doctors. He also testified that Defendant could have included that

warning in the Solyx's Instructions for Use, but Defendant failed to do so. Defendant also failed

to warn medical providers or the public of the Solyx's high failure rate, the inability to

completely remove the device due to complications, and the lack of evidence supporting the

safety and efficacy of the product. Had Mrs. Bagwell received sufficient warning regarding the

severity, frequency, and life-long complications the Solyx would present, she would not have

consented to having the device implanted.

US.131631310.01

<u>Breach of Express Warranty (Count IV)</u>

To state a claim for breach of express warranty under Colorado law, a plaintiff must prove the following: (1) the existence of a warranty, (2) breach of the warranty, (3) the breach proximately caused the losses claims as damages, and (4) defendant received timely notice of the breach. *Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc.,* 983 F.Supp. 948, 953 (D.Colo.1997) (citing *Palmer v. A.H. Robbins Co.*, 684 P.2d 187 (Colo.1984)). "When there is an express warranty, the question whether that warranty was breached is ordinarily one for the trier of fact." *Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc.,* 797 P.2d 835, 837 (Colo.App.1990). "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Palmer*, 684 P.2d at 208.

The evidence at trial will establish that Defendant made several statements in patient brochures, the Solyx's instructions of use, training events, and marketing avenues warranting that the Solyx was a safe and effective device for use. For instance, in April 1999, Defendant pledged to gather clinical data to assess product performance for its future sling materials, yet Defendant did not perform any clinical studies on the Solyx prior to its launch. The Solyx was not safe as Defendant warranted, and Mrs. Bagwell was severely injured due to Defendant's breach of those express warranties.

<u>Breach of Implied Warranty (Count V)</u>

Under Colorado law, goods must be merchantable and fit for the ordinary purpose in which the good is designed. C.R.S.A. § 4-2-314(2)(c). Merchantable goods, such as the Solyx, must also be adequately labeled and conform to the promises and affirmations represented by the

US.131631310.01

seller. *Id.* at (2)(e)-(f). The evidence at trial will show the Solyx was not: (1) fit for the ordinary purpose in which it was designed; (2) adequately labeled; and (3) conformed to Defendant's promises regarding the efficacy and sufficiency of the product. Mrs. Bagwell has been permanently and severely injured due to Defendant's breach.

<u>Discovery Rule, Tolling and Fraudulent Concealment (Count VI)</u>

Plaintiffs' strict liability claims are governed by Colorado's 2-year statute of limitations and Plaintiffs' breach of warranty claims are subject to a 3-year statute of limitations. C.R.S. § 13–80–106(1); C.R.S. § 13–80–101(1)(a). Furthermore, the parties agree that Colorado has a discovery rule, which provides that a cause of action for an injury to a person does not accrue until both the injury *and its cause* are known or could have been known with the exercise of reasonable diligence. C.S.R. § 13-80-108. The "determination of what the plaintiff knew or should have known is a quintessential fact question and is ordinarily one for [the jury]." *Minck v. BNSF Ry. Co.,* 2013 WL 3895031, at *2 (D. Colo. July 26, 2013) (citing *Granfield v. CSX Transp. Inc.,* 597 F.3d 474, 482 (1st Cir. 2010) and *Nichols v. Burlington N. & Santa Fe Ry. Co.,* 56 P.3d 106, 109 (Colo. App. 2002)).

As established in Mrs. Bagwell's deposition, the evidence at trial will show that Mrs. Bagwell did not attribute her injury to the Solyx device until the summer of 2011. According to the MDL Court's PTO #53 governing delayed filing procedures, Plaintiffs had until January 15, 2014 to timely file their lawsuit. On May 31, 2013, Plaintiffs served their Short Form Complaint on Defendant, and thereafter, timely filed their Complaint and Notice of Service Under Delayed Filing Agreement on October 8, 2013.

US.131631310.01

Under Colorado law, a claim for fraudulent concealment consists of the following elements: (1) the concealment of a material existing fact that in equity and good conscience the defendant should have disclosed; (2) knowledge on the defendant's part that such a fact was being concealed; (3) ignorance of that fact on the plaintiff's part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs* LLP, 420 P.3d 223, 234 (Colo. 2018) (citing *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011)). Furthermore, a statute of limitations may be tolled where plaintiffs can prove that a defendant fraudulently concealed "the material elements giving rise to their claims". *Patterson v. BP America Prod. Co.*, 360 P.3d 211, 220 (Colo. App. 2015) (citing *First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.,* 744 P.2d 1197, 1200 (Colo. 1987)).

At trial, Plaintiffs will present evidence and testimony identifying numerous material facts that Defendant concealed, misrepresented, and should have disclosed; Defendant knew they were concealing material facts; Plaintiffs were unaware of the material facts Defendant concealed and misrepresented; Plaintiffs acted in reliance upon Defendant's misrepresentations; and Mrs. Bagwell was severely injured and harmed as a result. For instance, internal documents and communications reveal Dr. Ty Erickson informed Defendant that there were "significant concerns" with the Solyx, and Dr. Erickson recommended full disclosure of the defects present. Defendant did not make full disclosure of the defects and represented that the Solyx was safe for implantation. Additionally, there were emails between Defendant's Group Marketing Manager and employees that reveal Defendant was aware of studies showing the Solyx device was prone to stiffness, which could cause erosion, but Defendant simply refused to act on these findings

and downplayed the risk publicly. Furthermore, as stated above, Defendant was aware that the polypropylene resin from which the Solyx mesh was made was not intended to be implanted into the human body, yet Defendant failed to disclose that information to doctors or patients. In fact, as medical journals began to shed light on mesh complications, Defendant purposefully sought to quickly publish literature discussing alleged positive uses of vaginal mesh. Had Defendant fully disclosed the permanent complications presented by the Solyx, Mrs. Bagwell would not have consented to having the device implanted.

<u>Punitive damages (Count VII)</u>

Plaintiffs will seek an award of exemplary damages. Under Colorado law, exemplary damages may be assessed in a civil action when "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." *See* C.S.R. § 13-21—102(1)(a). "Willful or wanton conduct" is conduct "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id*. at (1)(b). Accordingly, punitive damages may be awarded where a defendant "while conscious of his conduct and cognizant of existing conditions, knew or should have known, that the injury would probably result from his acts." *Qwest Services Corp. v. Blood*, 252 P.3d 1071, 1093 (Colo. 2011) (citing *Pizza v. Wolf Creek Ski Dev. Corp.,* 711 P.2d 671, 685 (Colo.1985)). Thus, "in order to establish *prima facie* proof of a triable issue, Plaintiffs must articulate '[a] reasonable likelihood that the issue [of whether Defendant's conduct was willful and wanton] will ultimately be submitted to the jury for resolution.'" *Colorado & Santa Fe Real Estate Co. v. Hartford Cas. Ins. Co.*, 2010 WL 3714751, at *2 (Colo. Sept. 14, 2010) (quoting *Leidholt v. Dist. Court in and for the City and County of*

18

*Denver,* 619 P.2d 768, 771 (Colo.1980)). "In cases properly involving punitive damages claims, it is within the province of the jury to determine the proper amount of punitive damages." *Bartholic,* 140 F.Supp.2d at 1118 (citing *Alley v. Gubser Dev. Co.,* 785 F.2d 849, 855 (10th Cir.1986)). The evidence at trial will establish that Defendant's conduct is egregious, and the award of exemplary damages in this case is proper.

**By Defendant**

**1.     Background**

**a.     Plaintiff Katrina Bagwell's Medical History**

On November 18, 2009, Mrs. Bagwell underwent a Solyx Single Incision Sling System ("Solyx") procedure performed by Dr. Cheryl Cowles in Wheatridge, Colorado in order to treat Mrs. Bagwell's stress urinary incontinence ("SUI"). Mrs. Bagwell alleges she has suffered pain, infection, urinary retention, painful intercourse, among other ailments, as a result of the implantation of the Solyx.

Mrs. Bagwell began experiencing issues in the year following her placement surgery. Between placement of the Solyx in November 2009 and August 2010, Mrs. Bagwell experienced abdominal pain; inability to lift more than 25 pounds; numbness down her right leg; urinary urgency, frequency, and retention; vaginal tenderness and pain; dyspareunia; inability to sit or squat without pain; and urinary pain and burning. Mrs. Bagwell attributed her alleged injuries to the Solyx device in the Summer of 2011 after watching a TV commercial.

**b.     The Solyx Device**

The Solyx is a single incision mid-urethral sling system designed to for the treatment of SUI. The Solyx was cleared by the FDA in August 2008. The risks associated with the Solyx and

other similar synthetic slings are known and documented in the applicable product labeling and medical literature. Despite these risks, most physicians agree that the benefits outweigh the risks inherent in these devices.

Boston Scientific creates the Solyx using polypropylene resin, a raw material polymer used in a wide range of medical applications. In 2004, the manufacturer of the raw resin, Phillips Sumika Polypropylene Company ("Phillips"), published a Caution statement in its Material Safety Data Sheet ("MSDS") which warned against the use of the raw resin in medical applications. After adding this Caution statement (with no known scientific study or review), Phillips contracted to sell this resin to Boston Scientific expressly for use in medical products. Courts have found that the MSDS Caution statement is hearsay if offered to show that polypropylene is unsafe for medical use, as it is only a "disclaimer of liability for the self-interested issuing party" with "no attempt to explain why polypropylene might be dangerous or how Phillips had come to this conclusion," despite "ample other evidence" of "polypropylene's viability as a material for surgical implants." *In re C.R. Bard*, 810 F.3d 913, 924, 925 (4th Cir. 2016). As part of the Solyx 510(k) premarket submission to the Food and Drug Administration ("FDA"), Boston Scientific included the 2004 MSDS for the Marlex polypropylene resin. The FDA cleared the Solyx fully aware of the MSDS.

It has long been recognized that mid-urethral slings like the Solyx are the gold standard in treatment of SUI. The leading urologic and urogynecologic medical societies have issued position statements confirming their long-term safe and efficacious use. By way of nonexhaustive example, the American Urogynecologic Society ("AUGS") stated, "[f]ull-length midurethral slings, both retropubic and transobturator, have been extensively studied, are safe

US.131631310.01

and effective relative to other treatment options and remain the leading treatment options and

current gold standard of care for [SUI]." Similarly, the American Urological Association

("AUA") stated:

> Extensive data exist to support the use of synthetic polypropylene mesh suburethral slings for the treatment of female SUI, with minimal morbidity compared with alternative surgeries ... It is the AUA's opinion that any restriction of the use of synthetic polypropylene mesh suburethral sling would be a disservice to women who choose surgical correction of SUI.

A recent joint opinion from AUGS and the Society of Urodynamics and Female Urology

("SUFU") reads: "The polypropylene mesh midurethral sling is the recognized worldwide

standard of care for the surgical treatment of [SUI]. The procedure is safe, effective, and has

improved the quality of life for millions of women." In 2011, the FDA, via an Obstetrics &

Gynecology Devices Panel commissioned to discuss the use of transvaginal mesh, found that the

safety and effectiveness of these types of mid-urethral sling devices is "well-established."

These statements are backed by long-term data that evidences the long-term safety and

effectiveness of polypropylene-based mid-urethral slings and the superiority of mid-urethral

slings over non-mesh SUI surgeries. Specific to the Solyx, a number of studies have been

published and/or presented that demonstrate the safety and effectiveness of this device.

**2.      Defenses to Plaintiff's Claims**

Plaintiffs originally asserted claims for (1) Negligence; (2) Strict Liability—Design

Defect; (3) Strict Liability – Manufacturing Defect; (4) Strict Liability—Failure to Warn; (5)

Breach of Express Warranty; (6) Breach of Implied Warranty; (7) Loss of Consortium; (8)

Discovery Rule and Fraudulent Concealment; and (9) Punitive Damages. Plaintiffs have

conceded in summary judgment briefing that they withdraw their claim for breach of implied

warranty of fitness for a particular purpose and their strict liability—manufacturing defect claim. *see* ECF Doc No. 66 at 14. Boston Scientific provides the following description of the legal bases for its defenses and reserves such defenses pending further discovery, ongoing receipt of medical records and investigation:

      **a.**      **Statute of Limitations, Waiver, Estoppel and/or Laches**: As set forth in Boston Scientific's pending motion for summary judgment, Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations. *See* Colo. Rev. Stat. § 13-80-106(1). Apart from breach of warranty claims, all product liability claims against a manufacturer are subject to a two-year statute of limitations, regardless of the legal theory under which they are brought. C.R.S. § 13-80-106(1); *see also Boyd v. A.O. Smith Harvestore Prods., Inc.*, 776 P.2d 1125, 1127 (Colo. App. 1989). Likewise, a tort action for loss of consortium not arising out of the use or operation of a motor vehicle is subject to a two-year statute of limitations. C.R.S. § 13-80-102(1)(a). Colorado follows the "discovery rule," thus, "[o]nce a plaintiff has suspicion of wrongdoing, she is under a duty to attempt to find the facts… [u]ncertainty as to the full extent of the damage does not stop the accrual of a cause of action." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 887 (10th Cir.2005); *see also Taylor v. Goldsmith*, 870 P.2d 1264, 1266 (Colo. App. 1994).

      This case was deemed filed as of May 31, 2013. Plaintiff alleges that between November 2009 and August 2010, after the placement of the Solyx device, she began suffering from a number of severe ailments allegedly due to the implantation of the device. In fact, Plaintiff alleges that during this time period, she began experiencing "abdominal pain; inability to lift more than 25 pounds; numbness down her right leg; urinary urgency, frequency, and retention;

vaginal tenderness and pain; dyspareunia; inability to sit or squat without pain; an urinary pain and burning" as well as "severe vaginal and pelvic pain, muscle spasms, and emotional pain and suffering." Because Plaintiff allegedly began experiencing several serious ailments between November 2009 and August 2010 after the implantation of the device, she was under a duty to attempt to find the facts *at that time*. Therefore, August 2010 is the date Plaintiff's action accrued because it is the date Plaintiff "should have known, in the exercise of reasonable diligence, the material facts essential to show her causes of action." See C.R.S. § 13-80-108(1). Plaintiff's personal injury, strict liability, and fraudulent concealment claims, and her husband's loss of consortium claim, were brought on May 31, 2013, more than two years after she discovered her alleged injury in August 2010. As such, these claims are barred by the applicable two-year statutes of limitations in Colorado.

      **b.**    **No Product Defect**: Even if Mrs. Bagwell had brought her strict liability (Counts II-IV) and negligent manufacturing (Count I) claims within the statute of limitation, those claims still fail because there is no evidence to support a theory that the Solyx device in question deviated from its manufacturing specifications or intended design.

      Whether brought as strict liability or negligence, a plaintiff must prove that the subject product was defective and unreasonably dangerous. *Mile Hi Concrete, Inc. v. Matz*, 824 P.2d 198, 205 (Colo. 1992). A product may be found to be "unreasonably dangerous" due to a manufacturing defect, design defect, or failure to warn. *Camacho v. Honda Motor Co. Ltd.*, 741 P.2d 1240, 1247 (Colo. 1987). The Solyx was neither defective nor unreasonably dangerous at the time it left Boston Scientific's control. There is no evidence the Solyx device in question deviated from its manufacturing specifications or intended design. *See Camacho v. Honda Motor*

23

*Co. Ltd.*, 741 P.2d 1240, 1247 (Colo. 1987). Indeed, there is no evidence to support a manufacturing defect claim, and Plaintiffs have conceded they will not proceed with this claim.

      **c.**    **Product Was Merchantable**: Mrs. Bagwell's claim for implied warranty of merchantability also fails. To succeed on a claim for breach of implied warranty of merchantability, a plaintiff must prove: (1) a sale of goods, (2) by a merchant of those goods, and (3) the goods were not of merchantable quality. *See* C.R.S. § 4-2-314. For goods to be "merchantable," they must be "fit for the ordinary purposes for which [they] are used," be "adequately contained, packaged, and labeled as the agreement may require," or "conform to the promises or affirmations of fact made on the container or label[,] if any." *Id.* at (2)(c), (e)-(f).

      Additionally, Colorado law "requires proof of a defect…in cases alleging…breach of warranty of merchantability." *Hauck v. Michelin N. Am., Inc.*, 343 F. Supp. 2d 976, 987 (D. Colo. 2004) (*citing Prutch v. Ford Motor Co.*, 618 P.2d 657, 660 (Colo.1980). As stated above, there is no evidence to support a product defect claim. Additionally, the Solyx was fit to treat Mrs. Bagwell's SUI, and there is no evidence to suggest that it was not. There is no evidence that the Solyx implanted in Mrs. Bagwell was not packaged or labeled appropriately for use prior to her procedure or that it did not conform to the affirmations of fact made on any labels. *See* C.R.S. § 4-2-314.

      **d.**    **Benefits Outweighed Risks:** Plaintiffs' product liability causes of action (Claims II-IV) are barred because the benefits of the Solyx outweighed its risks. *Fibreboard*, 845 P.2d at 1174. The risk-benefit test balances the benefits of the challenged design with its inherent risks of danger. *Armentrout v. FMC Corp.*, 842 P.2d 175, Prod. Liab. Rep. (CCH) P 13356 (Colo. 1992); Colo. Jury Instr., 4th Civil 14:3. Under this test—and even though a plaintiff

US.131631310.01

retains the burden of proof—if a plaintiff proves causation and offers evidence of a risk of harm posed by the product's claimed defect, the particular manufacturer, as a practical matter, must establish that the product's benefits outweigh its inherent risks. *Id.* Here, even if Plaintiffs prove causation and offer evidence of risk of harm due to a defect, which they cannot, the benefits of the Solyx still far outweigh any potential risks. Extensive data supports the use of synthetic polypropylene mesh suburethral slings for the treatment of female SUI, with minimal morbidity compared with alternative surgeries. As stated above, "[t]he polypropylene mesh midurethral sling is the recognized worldwide standard of care for the surgical treatment of [SUI]. The procedure is safe, effective, and has improved the quality of life for millions of women."

   e.   **State of Art:** Mrs. Bagwell's product liability claims are barred, in whole or in part, by Boston Scientific's compliance with the state of the art, industry standards, and/or applicable government statutes and regulations. At all relevant times during which the device at issue was designed, developed, manufactured, and sold, the device was reasonably safe and reasonably fit for its intended use, was not defective or unreasonably dangerous, and was accompanied by proper warnings, information, and instructions, all pursuant to generally recognized prevailing industry standards and state-of-the-art in existence at the time. *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1174 (Colo. 1993) ("State-of-the-art would be an applicable factor in a design-defect case if the alternative design suggested by the plaintiff was not practically feasible in light of the state of the art at the time the product was manufactured").

   f.   **To the extent it is an independent claim, Mrs. Bagwell's Fraudulent Concealment Claim fails:** Plaintiffs' Short Form Complaint and the Master Long Form Complaint demonstrate that the fraudulent concealment allegations are meant only to defeat a

US.131631310.01

statute of limitations defense and do not constitute a standalone claim for fraudulent concealment.

Even assuming Plaintiffs had appropriately alleged such a claim in their Complaint, there is no evidence to support it. The elements of a fraudulent concealment claim in Colorado include:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP America Production Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011) (*citing First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1987)). In support of this standalone claim, there is no evidence of Boston Scientific's knowledge of alleged facts being concealed, which is an essential element of this claim. Boston Scientific did not knowingly conceal a material fact regarding the Solyx that should have been disclosed. Further, no action by Mrs. Bagwell or her implanting physician was based on the concealment of a fact, which ultimately resulted in damages. *See id.*

       **g.**    **Learned Intermediary Doctrine:** Mrs. Bagwell's physicians were in the position of learned intermediaries/sophisticated purchasers, barring her strict liability – failure to warn claim (Count IV) to the extent it applies to anyone other than her doctors. *See Lynch v. Olympus Am., Inc.*, No. 18-CV-00512-NYW, 2018 WL 5619327, at *11 (D. Colo. Oct. 30, 2018). Under the learned intermediary doctrine, a medical device manufacturer satisfies its duty to warn so long as it provides adequate information to the physician who prescribes, installs, or facilitates the use of such device. Because Boston Scientific provided adequate risk information

to physicians, including Mrs. Bagwell's treating physician, about the Solyx device, the failure-to-warn claim is barred.

**h.      No Breach of Warranty Claim Exists**: In accordance with C.R.S. § 4-2-313, express warranties by a seller are created by an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." C.R.S. § 4-2-313(1)(a). Mrs. Bagwell did not exchange any communications directly with Boston Scientific regarding the Solyx, whether before or after her surgery. There is neither evidence to indicate the terms of an alleged warranty nor evidence that such terms were expressly made to Mrs. Bagwell, thereby inducing her to use the Solyx. *See Duncan v. Board of County Com'rs of Routt County*, 391 P.2d 368, 370-71 (Colo. 1964). Nor can Mrs. Bagwell identify any affirmation of fact or promise made by Boston Scientific that was part of a "basis of the bargain" between parties. C.R.S. § 4-2-313(1)(a). In an effort to establish an express warranty, Plaintiffs point to testimony from Mrs. Bagwell that she reviewed a brochure from Boston Scientific. But reading a brochure alone is not evidence of a warranty. In order to succeed on a breach of express warranty claim, Plaintiff must establish that an express warranty (or "affirmation of fact or promise") existed. *See* C.R.S. §4-2-313(1)(a). Because Plaintiff fails to identify which statements in the brochure allegedly constituted an "affirmation of fact or promise" Plaintiff cannot establish her breach of express warranty claim. See C.R.S. § 4-2-313(1)(a).

**i.      Restatement Defenses:** Mrs. Bagwell's strict liability design defect claim is barred under the Restatement (Third) of Torts. Plaintiffs cannot show "the foreseeable risks of harm posed by the [Solyx] are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits,

would not prescribe the drug or medical device for any class of patients." *Haffner v. Stryker Corp.*, No. 14-CV-00186-RBJ, 2014 WL 4821107, at *2 (D. Colo. Sept. 29, 2014) (citing the Restatement (Third) of Product Liability § 6(c)). As stated by the drafters of the Restatement, "a prescription drug or medical device that has usefulness to any class of patients is not defective in design even if it is harmful to other patients." *Id.* at *3 (citing Restatement (Third) of Torts § 6(c), cmt. b). Plaintiffs cannot present any evidence that the Solyx does not have usefulness to any class of patients. Rather, the evidence shows the Solyx is an effective treatment for SUI.

  **j.**  **Misuse or Change in Product:** Mrs. Bagwell's strict liability claims are barred to the extent that her alleged injuries were caused by the misuse, abnormal use, or use of the product at issue in a manner not intended by Boston Scientific and over which Boston Scientific had no control. The strict liability claims are also barred to the extent such injuries were caused by a substantial change in the product after it left the possession, custody, and control of Boston Scientific. *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1325 (Colo. 1986) (concept of misuse as defense to a products liability action includes the use of the product in a manner other than that which was intended as well as use for unintended purpose).

  **k.**  **Injury Not Foreseeable:** To the extent that the injuries and damages allegedly sustained by Plaintiffs were caused directly, solely, and proximately by sensitivities, medical conditions, and/or idiosyncrasies peculiar to Mrs. Bagwell and not found in the general public, they were unknown, unknowable, or not reasonably foreseeable to Boston Scientific. The claims set forth in the Complaint are barred because the alleged injuries and damages, if any, were caused by medical conditions, diseases, illnesses, or processes (whether pre-existing or contemporaneous) unrelated to the Solyx.

US.131631310.01

l.      **Superseding, Intervening Causes:** The injuries and damages to Plaintiffs were not caused by Boston Scientific but resulted from superseding and/or intervening causes over which Boston Scientific had no control. *See Bradford v. Bendix-Westinghouse Auto. Air Brake Co.*, 33 Colo. App. 99, 111, 517 P.2d 406, 413 (1973). Boston Scientific's expert, Dr. Rice, opined that any of Mrs. Bagwell's preexisting condition (urinary retention problems) and tension of the sling due to its particular placement in her body are the cause of any alleged injury.

m.      **Assumption of the Risk**: Mrs. Bagwell assumed the risk of injury when she acknowledged the particular risks associated with the Solyx, as evidenced by the consent form(s) she signed prior to surgery. Mrs. Bagwell voluntarily subjected herself to these risks, which demonstrate her willingness to accept such risks. Pursuant to the doctrines of assumption of the risk, informed consent, release, waiver, or comparative fault, this conduct bars in whole or in part the damages that Plaintiffs seek to recover herein.

n.      **Several Liability, Apportionment of Fault, Contributory Negligence, Nonparties at Fault**: Other parties and/or non-parties may be responsible for all or a portion of Plaintiffs' alleged damages. If Boston Scientific is found to be at fault, which is denied, and there are other parties and/or nonparties who are also at fault, there should be an apportionment of such fault among the parties and/or nonparties. *See Barton v. Adams Rental, Inc.*, 938 P.2d 532, 535 (Colo. 1997); Colo. Rev. Stat. Ann. § 13-21-111.5. The allocation of fault shall apply to any person and/or entity whose negligence or other fault contributed to Plaintiffs' alleged injuries and damages.

US.131631310.01

      **o.**     **Failure to Mitigate Damages:** The claims asserted in Plaintiffs'

Complaint may be barred, in whole or in part, by Plaintiffs' failure to exercise reasonable care

and diligence to mitigate damages, if any. *See City of Westminster v. Centric-Jones*

*Constructors*, 100 P.3d 472, 480 (Colo. App. 2003) (A party's failure to mitigate damages may

negate or reduce damages).

      **p.**     **Constitutional Defenses:** To the extent Plaintiffs' claims are based on a

theory providing for liability without proof of defect and proof of causation, such claims violate

Boston Scientific's rights under the Constitution of the United States and analogous provisions

of the Colorado Constitution. Plaintiffs' claim for punitive or exemplary damages violates the

Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States

of America, and similar provisions of the Colorado Constitution.

      **q.**     **Punitive Damages:** No act or omission of Boston Scientific was

malicious, willful, wanton, reckless, or grossly negligent, and, therefore, any award of punitive

damages is barred. Colo. Rev. Stat. § 13-21-102. Additionally, Boston Scientific is exempted

from Plaintiffs' punitive damages claims because (i) it complied with government regulations

pertaining to the design, development, manufacture, labeling, and sale of the Solyx device, and

(ii) the FDA cleared the Solyx for commercial sale in 2008. Under Colorado law,

> in any product liability action, it shall be rebuttably presumed that the product
> which caused the injury, death, or property damage was not defective and that the
> manufacturer or seller thereof was not negligent if the product:…Complied with, at
> the time of sale by the manufacturer, any applicable code, standard, or regulation
> adopted or promulgated by the United States or by this state, or by any agency of
> the United States or of this state.

Colo. Rev. Stat. Ann. § 13-21-403(1).

      **r.**     **Non-Economic Damages:** Damages for non-economic loss or injury may not exceed the general statutory cap, but the court may raise the amount in light of clear and convincing evidence. Colo. Rev. Stat. Ann. § 13-21-102.5(3)(a-c).

      **s.**     **Other Affirmative Defenses:** Other affirmative defenses in Boston Scientific's Answer were raised to avoid waiver. Boston Scientific reserves its right to supplement this section based on the information collected during discovery demonstrating that such additional defenses are applicable to Boston Scientific's defense of the issues presented in the case.

## 4. STIPULATIONS

The Parties stipulate that Plaintiff Katrina Bagwell was implanted with a Solyx Single Incision Sling System on November 18, 2009 for treatment of stress urinary incontinence. The Parties stipulate that Boston Scientific designed the device implanted in Katrina Bagwell. The Parties stipulate that the Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) and that venue is proper in the judicial district pursuant to 28 U.S.C. §§ 1391(b)(2).

## 5. PENDING MOTIONS

Defendant moved for summary judgement on May 13, 2019. Plaintiffs filed their response to Defendant's Motion for Summary Judgment on May 28, 2019. The MDL Court did not rule on Defendant's motion prior to transfer to this Court. Defendants filed a Renewed Motion for Summary Judgment in this Court on November 6, 2020. Plaintiffs filed their Response to Defendant's Renewed Motion for Summary Judgment on November 20, 2020.

## 6. WITNESSES

a.     List the nonexpert witnesses to be called by each party. List separately:

(1)      witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A));

(2)      witnesses who may be present at trial if the need arises (see Fed. R. Civ. P. 26(a)(3)(A)); and

(3)      witnesses where testimony is expected to be presented by means of a deposition and, if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

b.      List the expert witnesses to be called by each party. List separately:

(1)      witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A));

(2)      witnesses who may be present at trial (see Fed. R. Civ. P. 26(a)(3)(A));

and

(3)      witnesses where testimony is expected to be presented by means of a deposition and, if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

*[With each witness' name, set forth (1) the witness' address and telephone number if not previously disclosed, (2) a short statement as to the nature and purpose of the witness' testimony, and (3) whether he or she is expected to testify in person or by deposition.]*

Plaintiff's preliminary witness list is attached hereto as Exhibit A. Boston Scientific's

preliminary witness list is attached hereto as Exhibit B.

## 7. EXHIBITS

*[a. List the exhibits to be offered by each party and identify those to be stipulated into evidence. This list should be specific enough so that other parties and the court can understand, merely by referring to the list, each separate exhibit which will be offered. General references such as "all deposition exhibits "or" all documents produced during discovery" are unacceptable.]*

(1)      Plaintiff(s): See attached updated exhibit lists attached hereto as Exhibits C ("may use") and D ("will use").

(2)      Defendant(s): See attached updated exhibit lists attached hereto as Exhibit E ("may use") and F ("will use").

b.      Copies of listed exhibits must be provided to opposing counsel and any *pro se* party no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be

filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8. DISCOVERY

Discovery has been completed.

## 9. SPECIAL ISSUES

The Parties intend to file a status report identifying additional of the MDL Court's prior rulings in earlier waves of cases with respect to both parties' *Daubert* motions from Wave 5, for adoption by the court while allowing the parties to preserve their previous objections for appellate purposes.

The Court has previously handled similar requests upon a case transfer from an MDL. The Court found adoption of prior orders from earlier Waves of the MDL was appropriate when the orders addressed the same motions regarding the same experts at issue. *See Caldera v. Ethicon, Inc.*, No. 20-CV-00081-RM-STV, 2020 WL 728740 (D. Colo. Feb. 13, 2020).

## 10. SETTLEMENT

Counsel for the parties met numerous times in an attempt to resolve Ms. Bagwell's claim while the case was pending in the MDL and most recently by telephone on January 27, 2021, to discuss in good faith the settlement of this case. Counsel for the parties continue to engage in those discussions. It appears from previous discussions that there is some possibility of settlement. Counsel for the parties considered ADR in accordance with D.C. COLO.LCivR. 16.6. and will avail themselves of that option if they believe it will be productive in resolving the matter

US.131631310.01

## 11. OFFER OF JUDGMENT

Counsel acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

This matter is to be tried by a jury before Judge Raymond Moore in the Alfred A. Arraj United States Courthouse. Based on prior MDL trials and in other remanded cases, Plaintiffs estimate that a 10-14-day trial may be necessary. Boston Scientific estimates that 8-10 days are necessary for trial and suggests an even allocation of time between the parties, with each parties' presentation of evidence timed.

DATED this ___ day of _____, 2021.

BY THE COURT

_____
United States Magistrate Judge

APPROVED:

/s/ Daniel J. Thornburgh
Daniel J. Thornburgh, FL Bar No. 42661
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
T: 850-202-1010
F: 850-916-7449
dthornburgh@awkolaw.com

Admitted pro hac vice

Joseph J. Zonies, No. 29539
ZONIES LAW LLC
1700 Lincoln Street, Suite 2400
Denver, CO 80203
(720) 464-5300

jzonies@zonieslaw.com

*Attorney for Plaintiffs*

s/ Heather Carson Perkins
Heather Carson Perkins
Hannah C. Carter
FAEGRE DRINKER BIDDLE & REATH
LLP
1144 15th Street, Suite 3400
Denver, CO  80202
Telephone: 303-607-3500
Facsimile: 303-607-3600
Email:  heather.perkins@faegredrinker.com
         hannah.carter@faegredrinker.com

*Attorneys for Defendant Boston Scientific
Corporation*

35